CYTOGENIX, INC., Appellant,

v.

William B. WALDROFF and Applied Veterinary Genomics, Inc., Appellees.

No. 01–05–00492–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 14, 2006.

Rehearing Overruled March 2, 2007.

Robert W. Higgason, Law Office of Robert W. Higgason, Woodlands, for Appellant.

Louis Paine, Glast, Phillips & Murray, Houston, David S. O'Neil, O'Neil & McConnell, PLLC, Woodlands, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

## OPINION

JANE BLAND, Justice.

In this technology licensing case, CytoGenix, Inc., appeals the trial court's judgment and permanent injunction rendered in favor of appellees, William Waldroff and Applied Veterinary Genomics, Inc. ("AVGI"). CytoGenix sued Waldroff and

AVGI, seeking a declaration that two license agreements between CytoGenix and Waldroff are unenforceable. AVGI and Waldroff counterclaimed for declaratory relief and breach of contract. The jury found that CytoGenix breached the two agreements but awarded no damages. The trial court then entered judgment, issuing a permanent injunction requiring specific performance of the two licensing agreements, and awarding attorney's fees to Waldroff and AVGI.

We conclude that the trial court erred in entering a permanent injunction that requires specific performance of the licensing agreements because the agreements do not provide for specific performance or otherwise support specific performance by permanent injunction as a remedy. We further conclude that the trial court erred in awarding attorney's fees to Waldroff and AVGI because their claims for relief arise solely from breach of the licensing agreements, and the jury found no damages for breach of these agreements. Finally, we conclude that CytoGenix is not entitled to its attorney's fees upon reversal of the judgment against it. We therefore reverse the judgment of the trial court and render judgment that the parties take nothing on their claims against each other.

## FACTS AND PROCEDURAL HISTORY

### The Parties and Their Dealings

CytoGenix, formerly known as Cryogenic Solutions, Inc., is a Houston-based public company engaged in genetic research and development. At the time of the jury trial in February 2005, CytoGenix had yet to show a profit, develop a product for a clinical trial, or generate any significant revenue. However, it owns a number of patents in the area of genetic technology.

In 1996, CytoGenix became interested in developing gene silencing technology. In particular, CytoGenix sought to develop single stranded DNA ("ssDNA") that could control telomeres—the physical ends of linear chromosomes that play an important role in cell division—by controlling the enzyme telomerase.[1] One of the goals of ssDNA research is to develop a pharmaceutical compound that will stop production of harmful proteins. A necessary starting point for the research is the specific gene sequence for the cells under study, whether they are from animals, plants, bacteria, or viruses.

In 1998, Charles Conrad, a researcher who has developed an ssDNA expression vector, conveyed the right to use his technology to CytoGenix, together with a patent assignment. Before that point, from late 1996 through 1998, Conrad provided consulting services to CytoGenix in its research endeavors. While Conrad was consulting for CytoGenix, Mike Skillern, then CytoGenix's president, approached Waldroff with a request for funding for Conrad's research. Skillern and Waldroff discussed the possibility that Conrad's research could be useful for shrimp farms—either to prevent disease or to grow larger shrimp. Waldroff paid CytoGenix $15,000 in exchange for an exclusive agreement to use its ssDNA technology in connection with crustaceans. Later, Skillern prepared a similar agreement for horses and delivered it to Waldroff. Waldroff contends that he invested another $20,000 into CytoGenix in exchange for the equine license.

After the parties executed the crustacean license, Waldroff ventured briefly into

1. We do not describe this technology with any scientific expertise (nor, perhaps, any accuracy). The jury had the benefit of a power point presentation on the subject, but it is not included in the reporter's record of the trial other than by description from a witness.

creating a shrimp farm on his land. He bulldozed an area to build tanks. He filled the tanks with seawater and placed live shrimp in them. Unfortunately, the seawater heated to a temperature that was too hot for the shrimp and they died in three days. Waldroff froze the shrimp and ate them, and later filled the tanks with dirt. Waldroff testified that he would not have begun a shrimp farm had CytoGenix not granted a license to him.

Eventually, Waldroff assigned his rights in the two licenses to AVGI. AVGI was founded by Dell Gibson, who is also one of the founders of CytoGenix. Together with two other former CytoGenix board members, Gibson created AVGI to focus on potential veterinary applications arising from ssDNA technology. At the time this case was tried, AVGI, CytoGenix, and some of their directors were embroiled in other litigation. Malcolm Skolnick, the current chairman and president of CytoGenix, was at odds with Charles Boyd and Charles Bardwell, former CytoGenix directors who became directors of AVGI. As Waldroff described it, despite his efforts to reconcile those involved, "the animosity flowed" between CytoGenix and AVGI.

It was undisputed at trial that CytoGenix has never developed any ssDNA for shrimp or for horses, and that neither Waldroff nor AVGI had ever provided CytoGenix with the necessary gene sequencing for any shrimp or horse cells so that CytoGenix could pursue ssDNA development for cells found in those animals.[2] Rather, other than sporadic discussions about future technology development, activity pursuant to these licenses was dormant.

In February 2004, CytoGenix's attorney wrote Waldroff's attorney that CytoGenix would "not recognize" the license agreements. After a further meeting to discuss the licenses proved fruitless, CytoGenix filed this lawsuit, seeking a declaration that the license agreements are unenforceable.

### The License Agreements

CytoGenix and Waldroff entered into a "Crustacean ssDNA Vector License Agreement" effective April 5, 1998.[3] In the agreement, CytoGenix grants an exclusive license of its ssDNA technology to Waldroff "to use, sell, or license" the "technology or product(s) for use in Crustaceans." It further provides that CytoGenix retains title and ownership of the technology.

The parties executed the crustacean agreement before its April 1998 effective date. After the effective date, CytoGenix sent Waldroff a written agreement for an equine license, with the same effective date as the crustacean agreement and the same terms. Although Waldroff signed a copy of the equine agreement, no party produced a copy executed by CytoGenix, and the parties disputed at trial whether any existed-the jury finding that it did. Upon replacing the term "crustacean" with "equine," the provisions of the two agreements are identical.

2. At the time of trial, no other company had developed the ssDNA product that CytoGenix sought to develop. AVGI and Waldroff at one point forwarded a bovine (cow) gene sequence of some type to CytoGenix. No one testified, however, that it was appropriate to use this sequence for either horses or shrimp, and none of the parties testified that they pursued ssDNA research based on it.

3. The parties to the agreement are CytoGenix's predecessor-in-interest, Cryogenic Solutions, Inc., and Waldroff. For ease of reference, we use "CytoGenix" to refer to both it and its predecessor entity. Skillern executed the agreement on CytoGenix's behalf, in his capacity of president of the company.

In exchange for each license, Waldroff agreed to pay a six percent royalty on any gross revenue realized from the use or sale of CytoGenix's ssDNA vector technology, including any revenue from an increase in value of "crustacean [or equine] culturing products or cultured crustaceans [or equines]," and a six percent royalty on any revenue realized from licenses Waldroff might issue to third parties. Waldroff is responsible for any direct laboratory expense plus twenty percent for the production of ssDNA vector sequence coding, to be performed by CytoGenix or a laboratory it approves. The agreements do not, however, require either party to develop or provide technology of any sort. Waldroff is "responsible for providing DNA sequence codes to be coded into the ssDNA vector for use by Waldroff or any licensee."

If Waldroff defaults, CytoGenix has the right to cancel either agreement upon thirty days' written notice, subject to Waldroff's opportunity to cure the default. Waldroff also has the unfettered right to terminate the agreement on thirty days' written notice. But the agreement does not provide a parallel termination provision for CytoGenix: no clause allows CytoGenix to terminate the agreements, nor does one address the effect of CytoGenix's default, save that CytoGenix may not be liable for any direct, indirect, special, or consequential damages.

### The Lawsuit, Jury Verdict, and Judgment

In February 2004, CytoGenix sued Waldroff and AVGI in state district court, seeking a declaratory judgment that the licensing agreements are void for lack of essential terms and mutual mistake. Alternatively, it claimed that Waldroff breached the licensing agreements. AVGI and Waldroff counterclaimed, seeking enforcement of the licenses, actual damages, and attorney's fees. The case proceeded to trial.

The jury found that (1) CytoGenix granted a crustacean and an equine license to Waldroff; (2) CytoGenix failed to comply with the terms of the licenses; (3) Waldroff sustained no past damages for CytoGenix's breach of the licenses; (4) the equine license "exist[ed]"; (5) the crustacean license was "a reasonably definite and certain agreement between the parties"; and (6) Waldroff did not repudiate or breach the agreements. In a series of ancillary questions, the jury further found that (1) the parties did not have "the same understanding of the subject matter of the contract" with respect to the crustacean license, but the parties did not make any "mutual mistake of fact" with respect to either license; (2) CytoGenix made a "unilateral mistake of fact" with respect to both the crustacean and the equine license; (3) CytoGenix did not terminate the licenses after a reasonable period, but the parties did not intend for the licenses to be permanently binding; and, in seeming contradiction of its other findings, that (4) "essential terms are missing from both licenses." The parties stipulated to their respective attorney's fees.

In March 2005, the trial court entered a final judgment in favor of Waldroff and AVGI. In the judgment, the trial court recited: (1) the crustacean and equine agreements are valid; (2) CytoGenix breached the agreements; (3) any future damages are speculative and uncertain; (4) the technology is covered, at least in part, by patents; and (5) no adequate remedy at law exists for future breach. It ordered that (1) CytoGenix supply Waldroff with its ssDNA vector within forty-five days of any written request at a price of its direct laboratory expense plus twenty percent; (2) should CytoGenix fail to deliver its ssDNA vector at the ordered price, then

Waldroff is granted the right to obtain it from third parties without interference from CytoGenix; and (3) should CytoGenix fail to deliver the ssDNA vector, it must provide technical documentation to third party providers necessary to produce the ssDNA vector, subject to a reasonable confidentiality agreement. The court further awarded $45,000 in attorney's fees to Waldroff and $65,000 to AVGI through trial, plus additional fees to both conditioned on further appeal of the case.

CytoGenix moved for a judgment notwithstanding the verdict, to disregard certain of the jury's answers, and for a new trial. The trial court denied the motions in a written order in April 2005. This appeal followed.

## ANALYSIS

On appeal, CytoGenix complains that (1) the licensing agreements are unenforceable because they lack essential terms, and the evidence is legally and factually insufficient to support their enforcement; (2) the award of attorney's fees to AVGI and Waldroff is insupportable because the jury found no actual damages for breach of contract; (3) the trial court's permanent injunction is improper because the underlying agreements do not support specific performance as a remedy, and AVGI and Waldroff waived any claim for specific performance by submitting a claim for past actual damages to the jury; (4) the trial court's jury instructions are flawed; (5) the agreement is unconscionable as a matter of law; and (6) certain jury answers are against the great weight of the evidence. CytoGenix further contends that it should recover its attorney's fees upon reversal of the judgment against it.

### I. Breach of Contract

CytoGenix contends that the judgment for breach of contract against it should be reversed and rendered because (1) the li-

censes lack essential terms; (2) there was no meeting of the minds sufficient to form a contract; (3) the licenses are unconscionable; and (4) the jury's findings do not support a judgment for breach of contract. In connection with these claims, CytoGenix also contends that the evidence against it is legally insufficient. CytoGenix alternatively contends that the evidence is factually insufficient to support the judgment, requiring reversal and remand for a new trial. Finally, CytoGenix contends that the trial court erred in charging the jury on the contract claim.

### Essential Terms

A contract must be sufficiently definite in its terms to be legally binding. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992). If an agreement is so indefinite that a court cannot determine the legal obligations and liabilities of the parties, it is not an enforceable agreement. *Moore v. Dilworth*, 142 Tex. 538, 542–43, 179 S.W.2d 940, 942 (1944). An "essential" term is

one that the parties reasonably regarded, at the time of contracting, as a vitally important ingredient in their bargain. Failure to fulfill such a promise, in other words, would seriously frustrate the expectations of one or more of the parties as to what would constitute sufficient performance of the contract as a whole.

*Neeley v. Bankers Trust Co. of Tex.*, 757 F.2d 621, 628 (5th Cir.1985).

CytoGenix observes that the licensing agreements lack a provision for termination by CytoGenix or any term setting forth their duration. Without such a provision, CytoGenix maintains, no "meeting of the minds" occurred between it and Waldroff; thus, the agreement is unenforceable. AVGI and Waldroff respond that, although the agreements do not provide that CytoGenix can unilaterally termi-

nate them without cause, it can on Waldroff's default, and Waldroff can upon thirty days' notice. Thus, AVGI and Waldroff observe, the agreements provide for termination, just not in terms favorable to CytoGenix. Moreover, though the jury found that the parties did not intend the agreements to endure perpetually, Waldroff notes that the jury also found that CytoGenix's termination in this case was not after a reasonable period.

■ Some courts have held that the absence of a duration term "does not necessarily suggest that the parties did not enter into an enforceable agreement." *Avila v. Gonzalez*, 974 S.W.2d 237, 244 (Tex. App.-San Antonio 1998, pet. denied) (noting that, "[w]hen the duration of a contract is not expressly dictated by the agreement, courts will frequently presume that the parties intended the agreement to last for a reasonable time"). If no time for performance is stated in the contract, the law may imply a reasonable one if the contract is "sufficiently definite for a court to be able to fix the time when it can be enforced." *Dilworth*, 142 Tex. at 541, 179 S.W.2d at 942; *Avila*, 974 S.W.2d at 245 (noting that reasonable duration may be implied "in cases where the agreement contemplates that one party will make substantial expenditures or other investments in accordance with performance").[4] Thus, with some contracts, courts will examine the surrounding circumstances to determine the parties' intent as to the duration of the contract, so long as a standard exists by which one can test performance. *See* RESTATEMENT (SECOND) OF CONTRACTS § 33(2) (1981) ("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.").

In other cases, however, courts have concluded that a contract of indefinite duration is not enforceable because duration is essential to testing performance. *See Oakrock Exploration Co. v. Killam*, 87 S.W.3d 685, 691 (Tex.App.-San Antonio 2002, pet. denied) (holding that contract was unenforceable because it failed to include essential terms pertaining to character, extent, and duration of parties' rights); *Collins v. Allied Pharmacy Mgmt., Inc.*, 871 S.W.2d 929, 933 (Tex.App.-Houston [14th Dist.] 1994, no writ) (noting that letters "d[id] not set forth the alleged intended duration of three years, which [wa]s an essential term"). Waldroff and AVGI allege CytoGenix breached the license agreements by terminating them. Thus, the agreements here do not appear to provide "a basis for determining breach and an appropriate remedy" because the agreements lack a duration provision and early termination is the very source of CytoGenix's alleged breach. But this is juxtaposed against two jury findings: that the agreements were not intended to be perpetual and that CytoGenix's "early" termination was unreasonable.

---

4. *See also First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1012 (7th Cir.1985) ("When no termination date is specified in a contract, courts must look to surrounding circumstances to discover the intention of the parties."); *Neb. Nutrients, Inc. v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472, 499 (2001) ("[A] contract is not subject to the objection that it is indefinite so long as the parties can tell when it has been performed, and it is enough if, when that time arrives, there is in existence some standard by which performance can be tested.") (internal quotation omitted); *Hampton Tree Farms, Inc. v. Jewett*, 320 Or. 599, 892 P.2d 683, 692 (1995) ("[T]he absence of an explicit term regarding the time period of a contract is not necessarily fatal."); *First Nat'l Bank of Bluefield v. Clark*, 191 W.Va. 623, 447 S.E.2d 558, 562 (1994) ("[T]he failure of the parties to fix a time or definite time for performance does not normally defeat a contract. Instead, ... the law usually implies that performance shall be within a reasonable time.").

When viewed from the standpoint of "appropriate remedy," however, the answer is plain. Here, Waldroff and AVGI do not challenge the jury's finding against them that Waldroff sustained no actual damages. Because we conclude that the only relief the judgment affords—a permanent injunction and attorney's fees—are not remedies available to AVGI and Waldroff, we need not decide whether the agreements would be enforceable absent a duration term in other circumstances. Even assuming that they are, Waldroff and AVGI are not entitled to the relief the trial court's judgment affords.[5]

## II. The Permanent Injunction

CytoGenix requests that we vacate the trial court's permanent injunction for specific performance of the agreements because (1) even if the agreements are sufficiently definite to bind the parties, they are nonetheless insufficient to support a permanent injunction for specific performance; and (2) AVGI and Waldroff did not otherwise establish the elements necessary to obtain future specific performance as a remedy. We conclude that the licensing agreements lack the definiteness required for injunctive relief and that AVGI and Waldroff's claim for past actual damages based on the terms of the agreement demonstrates that they have an adequate remedy at law.

### Specific Performance via Injunction

■ In examining whether specific performance via injunctive relief is available as a contractual remedy, courts examine whether (1) an adequate remedy at law exists; (2) present performance is possible; (3) the agreement contains precise terms capable of enforcement; and (4) the injunction comports with the terms of the

agreement. We discuss each of these issues in connection with the licenses here.

■ First, courts do not enforce contractual rights by permanent injunction unless an aggrieved party can show an inadequate remedy at law and irreparable injury. *Canteen Corp. v. Republic of Tex. Props., Inc.*, 773 S.W.2d 398, 401 (Tex. App.-Dallas 1989, no writ); *Chevron U.S.A. Inc. v. Stoker*, 666 S.W.2d 379, 382 (Tex.App.-Eastland 1984, writ dism'd w.o.j.). An "irreparable injury" is one for which actual damages will not adequately compensate the injured party or the damages cannot be measured by any certain pecuniary standard. *Canteen Corp.*, 773 S.W.2d at 401; *Stoker*, 666 S.W.2d at 382; *see also Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002); *Minexa Ariz., Inc. v. Staubach*, 667 S.W.2d 563, 567 (Tex.App.-Dallas 1984, no writ). Money damages constitute satisfaction for injury resulting from a breach, whereas an injunction decrees specific performance, restraining any breach that would otherwise cause damage. *Eberts v. Businesspeople Pers. Servs., Inc.*, 620 S.W.2d 861, 864 (Tex.Civ.App.-Dallas 1981, no writ). The two remedies thus are exclusive of one another. *Id.*

■ Second, to order specific performance of a contract via an injunction, present performance must be possible. *Canteen Corp.*, 773 S.W.2d at 401. A court should not decree future contractual performance by requiring a party to perform a continuous series of acts, extending through a long period of time, over which the court exercises its supervision. *Id.*; *see also Tex. & Pac. Ry. Co. v. City of Marshall*, 136 U.S. 393, 407, 10 S.Ct. 846, 850, 34 L.Ed. 385 (1890); *Am. Hous. Resources, Inc. v. Slaughter*, 597 S.W.2d 13,

---

**5.** For the same reason, we do not address CytoGenix's complaints concerning the trial court's jury instructions, conflicting jury findings, and unconscionability.

15 (Tex.Civ.App.-Dallas 1980, writ ref'd n.r.e.). Instead, absent a significant public interest, parties to a private contract are left to their remedies at law. *Canteen Corp.,* 773 S.W.2d at 401.

Here, the trial court's injunction seeks to enforce the future contractual rights of the parties, not to stop any current breach of the agreements and enforce present performance. Whether Waldroff can prove that he and AVGI probably would have received future revenues from the agreements but for CytoGenix's breach—given their concession that such damages are speculative—is different from whether their contractual injuries can be quantified by "pecuniary standards." Under the terms of the license agreements, Waldroff and AVGI are entitled to a monetary division of revenues and royalties—i.e., the contemplated performance is pecuniary in nature. And, they sought money damages from the jury for past breaches of the agreements. We conclude that the agreements do not support specific performance by injunctive enforcement because AVGI and Waldroff did not show both that present performance is possible and that no adequate remedy at law exists.[6]

■ Third, these agreements do not contemplate enforcement of their terms by specific performance, or any sort of injunctive relief, and lack the precision necessary to support specific performance as a remedy. To support specific performance via injunctive relief, a contract must have precise terms capable of enforcement. *Living Christ Church, Inc. v. Jones,* 734 S.W.2d

417, 420–21 (Tex.App.-Dallas 1987, writ denied) (reversing judgment of specific performance where material terms of settlement agreement were not precisely drawn); *Guzman v. Acuna,* 653 S.W.2d 315, 319 (Tex.App.-San Antonio 1983, writ dism'd) (holding that agreement was not subject to specific performance because its essential terms were uncertain and ambiguous). Even if a missing duration provision is not a material element of the contracts so as to deny enforcement entirely, it nonetheless precludes specific performance by permanent injunction. Here, the contracts do not provide that they are ones of perpetual duration, nor that they can be enforced with specific performance or with an injunction, and the jury found, to the contrary, that the contracts were not ones of perpetual duration. Thus, the agreements do not support perpetual injunctive enforcement. *See Jones,* 734 S.W.2d at 420–21; *Guzman,* 653 S.W.2d at 319.

Finally, the permanent injunction exceeds the scope of the original agreements. The trial court's judgment orders CytoGenix to supply Waldroff with its ssDNA vector within forty-five days of any written request, at its direct laboratory expense plus twenty percent, and that Waldroff can obtain it from third parties without interference from CytoGenix. The injunction then orders something that is not present in either license agreement: should CytoGenix fail to deliver the ssDNA vector, it must provide technical documentation to third party providers necessary to produce the ssDNA vector, subject to a reasonable

---

6. We further note that the trial court's permanent injunction cannot be based on any protection of patent rights, for nothing in the agreements identifies a patent or otherwise purports to convey contractual rights to a patent. Rather, the injunction requires performance of agreements that do not identify any specific intellectual property and do not require that the parties develop such proper-

ty-the agreements instead *assume* that commercial use shrimp and horse ssDNA can and will be developed, and that Waldroff will provide the necessary gene sequences to accomplish this end. Moreover, AVGI and Waldroff did not maintain at trial that CytoGenix had interfered, or threatened to interfere, with any rights granted to Waldroff in the licensing agreements or to AVGI in the sublicenses.

confidentiality agreement. Leaving aside the matter that the injunction orders a technology transfer never contemplated in the agreements, by its very terms, the court's order is not capable of present performance: the parties agree that no ssDNA has ever been developed for a species of shrimp or horse; Waldroff has never presented CytoGenix with the shrimp or horse gene sequencing necessary to develop the corresponding ssDNA as the agreement requires; and nothing in the agreements obligates either party to do so by any date certain. The injunction thus does not seek to preserve the status quo or to prohibit a present action contrary to the express terms of the contracts. Rather, the injunction imposes an improper contractual remedy because it contemplates "a continuous series of acts which extend through a long period of time and require constant supervision by the court." *Canteen Corp.*, 773 S.W.2d at 401; *cf. Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993) (holding that trial court has discretion to issue temporary injunction to preserve status quo in breach of contract case if claimant demonstrates probable right to recovery and irreparable injury before trial can be had to recover actual damages).

We hold that (1) the agreements do not contemplate enforcement by specific performance via injunctive relief nor are they specific enough in their terms to do so, (2) AVGI and Waldroff have not shown that they lack an adequate remedy at law, and (3) specific performance as a contractual remedy is unavailable because AVGI and Waldroff made no showing that CytoGenix is capable of present performance of the contract. We therefore reverse the trial court's judgment ordering a permanent injunction.

### III. Attorney's Fees

CytoGenix requests that we reverse the attorney's fees awarded to Waldroff and AVGI because (1) Waldroff and AVGI did not specify in their pleadings the authority under which attorney's fees should be awarded; (2) the trial court awarded fees under the Declaratory Judgments Act (the "DJA"), and Waldroff and AVGI are not entitled to recover under the Act; and (3) attorney's fees are improper in a declaratory judgment action if the trial court awards no damages for a related breach of contract claim. In addition, CytoGenix requests that we award attorney's fees to it under the DJA, upon our holding the licenses to be unenforceable. We review the trial court's award of attorney's fees under the DJA for abuse of discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex.1985).

### Fees Awarded Pursuant to the Declaratory Judgments Act

A party cannot recover attorney's fees unless permitted by statute or contract. *Holland v. Wal–Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex.1999). This lawsuit is one for breach of contract. A party who prevails on a breach of contract claim may recover its reasonable attorney's fees pursuant to section 38.001(8) of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 1997). As the Texas Supreme Court has clarified, however, section 38.001(8) requires that a party recover actual damages to be entitled to an award of attorney's fees. *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex.1997) ("To recover attorney's fees under Section 38.001, a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages."); *see also Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 201 (Tex.2004) (per curiam) (noting that even though claimant had valid claim, it "was not entitled to recover attorney's fees because it

was not awarded damages on its breach of contract claim"). Because the jury did not award actual damages to Waldroff and AVGI, they are not entitled to an award of attorney's fees under section 38.001(8).

■ AVGI and Waldroff maintain, however, that the trial court properly awarded attorney's fees to them pursuant to the DJA. They note, moreover, that although the jury did not award any actual damages for breach of the license agreements, the trial court nonetheless entered a permanent injunction enforcing the agreements. Thus, they contend, the trial court had alternative bases for the attorney's fees award. As we have held that the trial court's permanent injunction ordering specific performance of the contracts is improper, it cannot support an award of attorney's fees.

Further, AVGI and Waldroff may not recover their fees based upon their claim for declaratory relief. Section 37.009 of the Texas Civil Practice and Remedies Code allows a trial judge to award attorney's fees to a party proceeding under the DJA. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997) ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just.").

■ A party may not, however, couple a declaratory plea with a damages action just to recover attorney's fees. *Hartford Cas. Ins. Co. v. Budget Rent–A–Car Sys., Inc.*, 796 S.W.2d 763, 772 (Tex. App.-Dallas 1990, writ denied). Thus, a trial court abuses its discretion in awarding attorney's fees under the DJA if the claim for declaratory relief is brought solely for the purpose of obtaining attorney's

fees. *Kenneth Leventhal & Co. v. Reeves*, 978 S.W.2d 253, 258–59 (Tex.App.-Houston [14th Dist.] 1998, no pet.) (holding that trial court abused its discretion in awarding attorney's fees under DJA when party received judgment in his favor based on breach of contract and DJA, but no damages award). Because Waldroff and AVGI did not recover any actual damages, they "cannot now use declaratory relief, identical to [Waldroff's] breach of contract claim, to pave the way to recover attorney's fees not otherwise available." *Id.* at 259. Because we have concluded that the relief the judgment affords is not supported by the agreements, we reverse the trial court's award of attorney's fees to Waldroff and AVGI under the DJA.[7]

### CytoGenix's Claim for Attorney's Fees

■ CytoGenix asks this court to award attorney's fees to it, in the amount the parties stipulated in the trial court, should we reverse the trial court's judgment. In its claim for declaratory relief, CytoGenix asked that the trial court declare the license agreements to be unenforceable. CytoGenix neither sought nor recovered any actual damages from Waldroff or AVGI from the jury. Thus, it is not entitled to its attorney's fees under section 38.001 based on the recovery of any actual damages. *See Mustang Pipeline*, 134 S.W.3d at 201; *Solis*, 951 S.W.2d at 390.

■ Rather, CytoGenix's sole basis for seeking a recovery of its attorney's fees is its successful defense against Waldroff and AVGI's breach of contract claim. Section 38.001, however, does not provide for at-

---

**7.** AVGI did not seek actual damages under the license agreements, nor did it present evidence of irreparable injury or actual damages distinct from Waldroff. Because the only relief AVGI sought was through Wal-

droff's rights under the agreements, we conclude that AVGI has not demonstrated any independent ground for recovery of its attorney's fees.

torney's fees for a party's successful defense against a breach of contract claim. *G.R.A.V.I.T.Y. Enters., Inc. v. Reece Supply Co.,* 177 S.W.3d 537, 551 (Tex.App.-Dallas 2005, no pet.); *Wilson & Wilson Tax Servs. v. Mohammed,* 131 S.W.3d 231, 240 (Tex.App.-Houston [14th Dist.] 2004, no pet.); *Melson v. Stemma Exploration & Prod. Co.,* 801 S.W.2d 601, 604 (Tex. App.-Dallas 1990, no writ). CytoGenix's claim for declaratory relief is nothing more than a suit in avoidance of a contract, and like Waldroff and AVGI, it did not recover any actual damages. Accordingly, we hold that it is not entitled to the attorney's fees it incurred in the prosecution or defense of this suit. *See G.R.A.V.I.T.Y. Enters.,* 177 S.W.3d at 551; *Mohammed,* 131 S.W.3d at 240; *Melson,* 801 S.W.2d at 604.

## CONCLUSION

We conclude that the trial court erred in entering a permanent injunction that requires future specific performance of the licensing agreements and in awarding attorney's fees to Waldroff and AVGI. We further conclude that CytoGenix is not entitled to its attorney's fees upon reversal of the judgment against it. We therefore reverse the judgment of the trial court and render judgment that the parties take nothing on their claims.