Opinion issued July 8, 2010 
















In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-08-00994-CV
__________
 
JOHN GANNON, INC., Appellant/Cross-Appellee
 
V.
 
MATTHEW D. WIGGINS, Appellee/Cross-Appellant
 

 
 
On Appeal from the 212th District Court
Galveston County, Texas
Trial Court Cause No. 06-CV-0246
 

 
 
MEMORANDUM OPINION
          Appellant/cross-appellee, John Gannon, Inc. (“JGI”), challenges the trial
court’s judgment, entered after a jury trial, awarding JGI damages in its suit for
breach of contract against appellee/cross-appellant, Matthew D. Wiggins. In two
issues, JGI contends that the trial court erred in excluding evidence of its damages
and denying its request for a continuance. Wiggins, as a cross-appellant, contends
in two issues that the trial court erred in denying his motion for judgment
notwithstanding the verdict in which he asserted that there was no enforceable
contract between the parties, who had not agreed upon the essential terms of the
contract, and, alternatively, the trial court erred in denying his summary judgment
motion in which he asserted that any contract between the parties was terminable at
will or violated the statute of frauds.  
          We reverse and render a take-nothing judgment in favor of Wiggins. 
Factual and Procedural Background
          In its petition, JGI alleged that it constructed three advertising billboards for
Wiggins on Wiggins’s land for a total cost of approximately $260,400 and Wiggins
owed JGI an outstanding balance of approximately $110,000 for its construction
costs. “[I]n addition,” JGI and Wiggins agreed that JGI would receive 25% of the
billboard rental income, Wiggins failed to pay JGI its share of the rental income, and
JGI had also incurred various advertising and maintenance costs that it was entitled
to recoup from Wiggins. JGI asserted claims for breach of contract and quantum
meruit, and it sought an accounting of all rental income derived from the billboards. 
Wiggins filed a general denial and counterclaim, in which he alleged that JGI had
agreed to act as his agent in connection with renting his billboards, but JGI had
misappropriated money, breached its fiduciary duty, and breached the contract.           At trial, John Gannon testified that he is the owner and operator of JGI and, in
2001, he and Wiggins engaged in many discussions in which they orally agreed that
JGI would build three billboards “at industry cost” for Wiggins on his properties in
Kemah. JGI was to handle the leasing and maintenance of the billboards, Wiggins
would secure the necessary permits, JGI would be entitled to 25% of the rental
income from the billboards after expenses, and Wiggins would be entitled to the
remaining 75%. Gannon explained that because JGI was “in the business” to “rent”
rather than “build” signs, JGI agreed to construct Wiggins’s billboards “below cost.” 
Under the “pretty simple” agreement, JGI was to secure clients, place the advertising
on the billboards, and authorize repairs and maintenance. 
          Gannon further testified that the billboards remained on Wiggins’s property,
Wiggins was free to sell the billboards, and JGI did not acquire an interest in
Wiggins’s property or the billboards. Gannon conceded that “there was no mention”
of the business arrangement as being “a long-term deal” and the parties had not
discussed their termination rights in the event that they became dissatisfied with the
arrangement or the other party’s performance. Gannon stated that it was his
“assumption” that Wiggins “would keep these properties for a long period of time.” 
          Pursuant to their agreement, JGI completed construction of the first billboard,
referred to as the “restaurant billboard,” in June 2002 and a second billboard, referred
to as the “bridge billboard,” in September or October 2002. At some point in 2002,
JGI also began construction of a third billboard, referred to as the “park billboard,”
and, after encountering permitting problems, JGI completed construction of the park
billboard at Wiggins’s instructions. However, Wiggins subsequently instructed JGI
to remove the park billboard, and JGI thereafter constructed a tri-faced billboard,
referred to as the “2094 billboard,” on another of Wiggins’s properties. 
          Gannon explained that JGI placed advertising on some of these billboards for
Wiggins’s restaurant in the Kemah area, in part, as an attempt to “force” Landry’s
restaurants, owner of the Kemah boardwalk and other competitor restaurants, to
advertise on Wiggins’s billboards. JGI charged Wiggins for the layout, printing, and
placing of advertising for Wiggins’s restaurant on the billboards. Although JGI did
not charge Wiggins any rental fees for the advertisements, Gannon thought that JGI
should have done so. JGI did furnish invoices to Wiggins for the restaurant, bridge,
park and 2094 billboards for total construction and associated costs of $260,000. 
And Wiggins did pay JGI $150,000, leaving an outstanding balance of $110,000, plus
some additional costs.
          Gannon also testified that on December 23, 2003, JGI received from Wiggins
a letter in which Wiggins stated that he had completed “a deal with Landry’s on the
land and the billboards on [his] property in Kemah” and “Landry’s has now changed
out” the billboards. Wiggins requested a new bill from JGI reflecting revenues for
the restaurant, bridge, and 2094 billboards and credits for materials from the park
billboard, which had been removed. Gannon noted that Wiggins had not expressed
any dissatisfaction with JGI’s performance under the parties’ business arrangement. 
          At the time that Gannon received Wiggins’s letter, JGI had already reached
agreements to lease the 2094, bridge, and restaurant billboards to other clients, and
JGI had provided Wiggins with copies of the leases and an accounting of all monies
received under these leases. When Gannon went to the billboard sites, he saw that
someone had posted “no trespassing” signs and new contact information on the
billboards. Gannon believed that Wiggins had breached their agreement, he felt
“duped,” and, when he complained to Wiggins, Wiggins told him to file a lawsuit. 
Gannon had to cancel the lease agreements with his other clients as a result of
Wiggins’s new agreement with Landry’s. 
          On cross-examination, Gannon agreed that he had not provided Wiggins with
anything in writing to set forth the construction costs for the billboards. But Gannon
explained that he had provided Wiggins with oral estimates, subject to variances, of
costs of $35,000 to $45,000 for the restaurant billboard, $85,000 to $90,000 for the
bridge billboard, $65,000 for the park billboard, and $75,000 for the 2094 billboard. 
Gannon also agreed that JGI did not secure its first paying customer for the billboards
until August 2003.


 But he explained that JGI could not secure customers until 2003
because Wiggins had permitting problems and the billboards did not have electricity
for lighting. Gannon further agreed that JGI had not provided Wiggins with any
statements reflecting rental amounts paid by third parties. But he explained that JGI
had previously split the advertising revenues from the billboards by providing
Wiggins with credits for costs associated with the billboards. 
          Wiggins testified that in 2001, Gannon offered to construct the restaurant and
park billboards for $25,000 to $30,000 each and Wiggins accepted the offer. Wiggins
understood that JGI would be making a profit from building the billboards, and they
had not discussed any business arrangement in which JGI would rent the billboards. 
After JGI completed the restaurant billboard, Wiggins instructed it to place on it
advertising for Wiggins’s restaurant. JGI then commenced construction of the park
billboard, but the City of Kemah eventually challenged the construction of the park
billboard. In July 2002, Wiggins agreed to donate the land on which the park
billboard sat to Kemah, and, in exchange, Kemah provided Wiggins with permits for
constructing the 2094 and bridge billboards. 
          Wiggins stated that JGI had provided him with cost estimates of $60,000 to
$90,000 to construct the bridge billboard and $40,000 to $50,000 to construct the
2094 billboard. After Wiggins had agreed to pay these construction costs, Gannon
and Wiggins, for the first time, discussed an agreement to split revenue from any
lease agreements for the billboards that JGI brought to Wiggins. Wiggins stated that
any such lease agreements were subject to the availability of the billboards and he
was entitled to advertise his own businesses on his billboards without paying rent to
JGI. Wiggins explained that he and Gannon had not agreed to, or even discussed, a
duration of this business arrangement or how to handle the situation of one party
becoming “unhappy with the arrangement.” Rather, the business arrangement would
last “as long as it worked,” and he denied that the parties intended for the
arrangement to last for as long as he owned the billboards. 
          JGI began building the bridge billboard in August 2002 and sent Wiggins an
invoice totaling approximately $270,000 for construction costs for all four billboards. 
Wiggins noted that the invoiced amounts for the bridge and restaurant billboards were
“close” to JGI’s original estimates, but the amount for the park billboard quote was
not “close” to the original estimate. At the time, the 2094 board was not constructed,
so Wiggins did not consider that portion of the invoice. After Wiggins discussed the
invoice with Gannon, JGI submitted a revised bill for approximately $260,000. 
Wiggins then paid JGI $150,000 ($30,000 for the restaurant billboard, $30,000 for
the park billboard, and $90,000 for the bridge billboard), which is what Wiggins
believed he had originally agreed to pay for these billboards. JGI began building the
2094 billboard shortly thereafter and completed it in November 2002. 
          Wiggins further testified that he personally rented one face of the 2094
billboard to a third party and he did not share that revenue with JGI because that was
not part of their agreement. Wiggins complained that JGI had in the Kemah area
other billboards, which “were full” of advertising, but his billboards were not. He
noted that JGI had never requested permission to place signs on the billboards
advertising that JGI was renting them, and, when he inquired about the lack of
advertising that JGI was bringing to the billboards, Gannon told him that “things were
a little bit slow.” Wiggins believed that the bridge billboard had electricity for
lighting in September 2002, the restaurant board in January 2003, and the 2094 board
in March 2003. 
          In August 2003, Wiggins informed Gannon that he was getting a “deal” with
Landry’s and, as a result, his restaurant and bridge billboards would not be available
for leasing. Although Wiggins denied putting “no trespassing” signs on any of his
billboards, he had no further communication with JGI after he sent it his December
2003 letter. Wiggins assumed that JGI would continue to try to sell advertising for
the tri-faced 2094 billboard because he had not told JGI that their arrangement in
regard to the 2094 billboard was over. JGI did not procure any additional business
for the 2094 billboard, and Wiggins continued to try to personally sell advertising for
it. 
          At the time that he had sent the December 23, 2003 letter, Wiggins understood
that JGI was claiming an outstanding balance of $110,000, but Wiggins believed he
only owed JGI $50,000 for the construction of the 2094 billboard, plus other costs for
the installation of vinyls on the boards. He noted that there were additional,
outstanding accounting issues, including his claim of a credit for salvaged materials
used on the park billboard as well as his claim for his percentage of the rental
revenues from the billboards as JGI had never paid him any of the rental revenue
from the billboards. In May 2005, Wiggins received a letter from JGI stating that he
still owed it approximately $116,000 for the billboards.  
          On cross-examination, Wiggins agreed that he owed JGI money, but he did not
know how much. He noted that the parties disputed the reasonableness of the amount
claimed for the construction costs and other costs, and he had previously complained
to Gannon that the price that JGI was charging for the 2094 billboard was different
than the agreed price. Wiggins also agreed that he had leased to Landry’s the
properties and all the improvements on the land on which the park and restaurant
billboards were located and, under the lease, he could not do anything to the
properties. Wiggins explained that he had entered into the lease with Landry’s to
settle an unrelated lawsuit concerning other properties in the Kemah area. He noted
that the billboards were not a major part of his lease with Landry’s and the lease
actually covered real properties in the Kemah area.
          After the closing of the evidence, the trial court, in its charge, submitted to the
jury the following question:
QUESTION NO. 1
 
          Did JGI and Wiggins intend to bind themselves to an agreement
that included the following terms:
 
          a.       An estimated price for the construction of four billboards
in Kemah, Texas and the removal of one of them in 2002;
and
 
          b.       JGI would rent the billboards and would pay 75% of net
advertising revenues to Wiggins keeping 25% of such
revenues for itself; and
 
          c.       The duration of this agreement was to be so long as
Wiggins owned the billboards.
 
ANSWER:  YES
 
The trial court also submitted a series of four questions predicated upon a “Yes”
answer to the first question, asking whether (1) Wiggins failed to comply with the
agreement, (2) JGI failed to comply with the agreement, (3) Wiggins’s failure to
comply was excused by JGI’s previous failure to comply with a material obligation
of the same agreement, and (4) JGI’s failure to comply was excused by Wiggins’s
previous failure to comply with a material obligation of the same agreement. The jury
found that both Wiggins and JGI failed to comply with the agreement and that neither
party’s failure was excused. 
          The trial court then submitted, and the jury answered as indicated, the
following damages questions:
QUESTION NO. 6
 
          What sum of money, if any, if paid now in cash, would fairly and
reasonably compensate JGI for its damages, if any, that resulted from
Wiggins’s failure to comply with the Contract.
 
          Consider the following elements of damages, if any, and none
other.
 
          The amount owed to JGI, if any, for construction and demolition
costs of the billboards.
 
          The amount owed to JGI, if any, as compensation for its portion
of rental income generated by the billboards.
 
. . . . 
 
          a.       Construction/demolition costs sustained in the past:
 
                    ANSWER:  $123,418
 
          b.       Rental income sustained in the past
 
                    ANSWER:  $14,447.16
 
QUESTION NO. 7
 
          What sum of money, if any, if paid now in cash, would fairly and
reasonably compensate Wiggins for his damages, if any, that were
proximately caused by such conduct?
 
          Consider the following elements of damages, if any, and none
other.
 
          The value of the materials salvaged from the removal of the park
billboard.
 
          The amount of rental income due to Wiggins from the income
collected by JGI between September 2002 and March 2004.
 
. . . . 
 
          a.       Value of materials from park billboard sustained in the
past:
 
                    ANSWER:  $0
 
          b.       Unpaid rental income sustained in the past
 
                    ANSWER:  $34,367.48
 
These damages questions were predicated on the jury’s finding that the parties’ failed
to comply with the agreement and the failures were not excused.


 
          JGI subsequently filed its motion for entry of a judgment on the jury’s verdict. 
Wiggins then filed its motion for judgment notwithstanding the verdict, contending
that the evidence presented at trial established that there was no agreement as to the
duration of any business arrangement between JGI and Wiggins. Wiggins asserted
that the trial court should disregard the jury’s finding in question number one that JGI
and Wiggins intended to bind themselves to an agreement that included a term that
“the duration of the agreement was to be so long as Wiggins owned the billboards.” 
Wiggins requested that the trial court enter a take-nothing judgment in its favor.
Wiggins’s motion was overruled by operation of law. 
          The trial court granted JGI’s motion for entry on the jury’s verdict and entered
its final judgment, awarding JGI actual damages from Wiggins in the amount of
$103,497.68. 
Judgment Notwithstanding the Verdict
          In his first issue, Wiggins, as cross-appellant, argues that the trial court erred
in denying his motion for judgment notwithstanding the verdict because there was no
enforceable contract between the parties, who had not agreed upon the “essential
terms” of the duration or of the manner of termination of their agreement. Wiggins
asserts that there is no evidence to support the jury’s finding that JGI and Wiggins
“intend[ed] to bind themselves to an agreement” with a duration for “so long as
Wiggins owned the billboards.”
          A judgment notwithstanding the verdict is proper when a directed verdict
would have been proper. Tex. R. Civ. P. 301; Fort Bend County Drainage Dist. v.
Sbrusch, 818 S.W.2d 392, 394 (Tex. 1991). We review both the denial of a motion
for judgment notwithstanding the verdict and a challenge to the legal sufficiency of
the evidence as “no evidence” points of error. Steinberg v. Comm’n for Lawyer
Discipline, 180 S.W.3d 352, 355 (Tex. App.—Dallas 2005, no pet.). We will sustain
a legal sufficiency or “no-evidence” challenge if the record shows one of the
following: (1) a complete absence of evidence of a vital fact, (2) rules of law or
evidence bar the court from giving weight to the only evidence offered to prove a
vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or
(4) the evidence conclusively establishes the opposite of the vital fact. City of Keller
v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal sufficiency
review, a court must consider the evidence in the light most favorable to the verdict
and indulge every reasonable inference that would support it. Id. at 822. If the
evidence allows only one inference, neither jurors nor the reviewing court may
disregard it. Id. However, if the evidence at trial would enable reasonable and
fair-minded people to differ in their conclusions, then jurors must be allowed to do
so. Id. A reviewing court cannot substitute its judgment for that of the fact finder,
so long as the evidence falls within this zone of reasonable disagreement. Id.
          We initially note that the record supports the jury’s finding (under subpart a of
that question) that JGI provided Wiggins with an estimated price for the construction
of four billboards and the removal of one of those billboards and that Wiggins agreed
to pay JGI the construction and other associated costs. In fact, Wiggins agreed that
he owed JGI an outstanding amount for these construction and other costs, although
he disputed the amounts claimed. The record also supports the jury’s finding (under
subpart b of question number one) that JGI and Wiggins agreed to share advertising
revenues derived from these billboards and that JGI would rent the billboards and
would pay 75% of the net advertising revenues to Wiggins and keep 25% of such
revenues for itself. Again, Wiggins agreed that JGI would be entitled to 75% of any
net advertising revenues from business that JGI brought to the billboards, although
the parties disputed whether this was an exclusive business arrangement.


 Thus, the
jury’s findings that the parties “intend[ed] to bind themselves to an agreement” to the
terms set forth in subparts a and b of question number one are supported by legally
sufficient evidence. 
          However, the submitted question, in subpart c, further asked the jury to
determine whether the duration of the agreement between JGI and Wiggins “was to
be so long as Wiggins owned the billboards.” More significantly, as explained
below, the jury’s award of damages, and the resulting judgment entered in favor of
JGI, was predicated upon an affirmative finding by the jury that the duration of the
agreement “was to be so long as Wiggins owned the billboards.” 
          In his testimony, Gannon conclusively established, contrary to the jury’s
finding, that the parties did not intend to enter into their business arrangement
regarding revenue sharing for “so long as Wiggins owned the billboards.” During
Gannon’s testimony, the following exchange occurred:
          [Wiggins’s counsel]:       Back to this agreement that you testified. . . .
Did you go back any make any notes and
write down what the terms of the agreement
were?
 
          [Gannon]:                        No. I can remember that much. It’s 25, 75.
 
          [Wiggins’s counsel]:       Were there any other terms of the agreement
other than what you testified about?
 
          [Gannon]:                        No. It’s pretty simple.
 
          [Wiggins’s counsel]:       So, counsel said that Mr. Wiggins was to own
the boards?
 
          [Gannon]:                        That’s correct.
 
          [Wiggins’s counsel]:       And he was free to — I assume he was free to
sell them to whoever he wanted to if he
decided to sell them?
 
          [Gannon]:                        I assume so.
 
          [Wiggins’s counsel]:       He could have sold these boards after they
were constructed you wouldn’t have had a
complaint about it?
 
          [Gannon]:                        I would have had a severe complaint with
that.
 
          [Wiggins’s counsel]:       But these were his boards?
 
          [Gannon]:                        I’m not in the business to build boards. I’m in
the business to build faces. The only reason
we did this was for the income stream in the
future. I mean that’s one thing we need to
clear up.
 
          [Wiggins’s counsel]:       . . . I’m just wondering you told us all the
terms to this agreement. Was there any
discussion between you and Mr. Wiggins of
that fact that as far as you were concerned he
wasn’t free, even though he owned the
boards, he was paying you to build them, he
was not free to sell them to somebody else
without running into problems with you.
 
          [Gannon]:                        Matt owned these properties where these
signs were build. And Matt had not sold any
property down there. He had just been
buying. So my assumption again is that he
would keep these properties for a long period
of time.
 
          [Wiggins’s counsel]:       . . . .That was your assumption that this would
be a long term deal?
 
          [Gannon]:                        That’s correct.
 
          [Wiggins’s counsel]:       What I’m asking you was there an
agreement? Was there specifically an
agreement that this would be a specific long-term deal.
 
          [Gannon]:                        No. There was no mention of that.
 
(Emphasis added.) Gannon also agreed that the parties had no discussion of what
would happen in the event that JGI defaulted under the agreement or how a party to
the agreement could terminate the agreement if it was dissatisfied with the other
party’s performance. 
          Wiggins also testified that the parties had not agreed, or even discussed, how
long the business arrangement would last. He did not provide Gannon with any
guarantee that the agreement would last a certain period of time, and Gannon never
asked for any such guarantee. Rather, Wiggins testified that he intended the
agreement to last “as long as it worked.” Thus, the trial testimony of both parties
reveals that they had not agreed to a long-term deal and, more relevant to the wording
of jury question number one, there is no evidence that the agreement was to last “as
long as Wiggins owned the billboards.”
          Based upon the surrounding circumstances, the understandings of the parties,
and the subject matter of the contract, JGI asserts that the evidence is legally
sufficient to support the jury’s finding that the “implied duration” of the agreement
was for as long as Wiggins owned the billboards.


 It further asserts that “both parties
understood the agreement to be an ongoing contract.”


 
          Texas courts have explained that the lack of a specific duration term in an
agreement “does not necessarily suggest that the parties did not enter into an
enforceable agreement.” Cytogenix, Inc. v. Waldroff, 213 S.W.3d 479, 486 (Tex.
App.—Houston [1st Dist.] 2006, pet denied) (quoting O’Farrill Avila v. Gonzalez,
974 S.W.2d 237, 244 (Tex. App.—San Antonio 1998, pet. denied)). If an agreement
does not provide a “time for performance,” “the law may imply a reasonable one if
the contract is ‘sufficiently definite for a court to be able to fix the time when it can
be enforced.’” Id. (citing Moore v. Dilworth, 142 Tex. 538, 543, 179 S.W.2d 940,
942 (1944); O’Farrill Avila, 974 S.W.2d at 245). For example, a reasonable duration
may be implied when an “agreement contemplates that one party will make
substantial expenditures or other investments in accordance with performance.” 
O’Farrill Avila, 974 S.W.2d at 245. Courts may examine the surrounding
circumstances to determine the intended duration of a contract, “so long as a standard
exists by which one can test performance.” Cytogenix, Inc., 213 S.W.3d at 486; see
also Metromarketing Servs., Inc. v. HTT Headwear, Ltd., 15 S.W.3d 190, 195–96
(Tex. App.—Houston [14th Dist.] 2000, pet. denied) (stating that courts may imply
reasonable duration “from all the circumstances surrounding the adoption of the
agreement, the situation of the parties, and the subject matter of the contract”);
Restatement (Second) of Contracts § 33(2) (1981) (“The terms of a contract are
reasonably certain if they provide a basis for determining the existence of a breach
and for giving an appropriate remedy.”).
          Here, however, there is a complete lack of evidence supporting any “implied
duration” found by the jury. There is no evidence that either party entered into the
agreement intending to bind Wiggins to a revenue-sharing relationship with JGI for
“so long as Wiggins owned the billboards.” Such a term could have potentially
established an extremely lengthy commitment from Wiggins. Yet, the only evidence
even remotely related to such a finding was Gannon’s testimony that he “assumed”
that he had a “long-term” deal with Wiggins. However, Gannon, in no uncertain
terms, testified that he and Wiggins did not have any discussions about such a “long-term” deal. More importantly, he provided no evidence that their agreement was to
last for “as long as Wiggins owned the billboards,” which is what the jury was
required to find in order to answer question number one affirmatively. In fact, not
only is there no evidence to support the jury’s implied duration finding, but the
evidence presented conclusively established that the parties did not agree to a
revenue-sharing agreement for “so long as Wiggins owned the billboards.” As noted
above, an affirmative finding to subpart c was necessary in order for the jury to make
an affirmative finding to question number one.


 Accordingly, we hold that the
evidence is legally insufficient to support the jury’s answer to question number one
and the trial court erred in denying Wiggins’s motion for judgment notwithstanding
the verdict. 
          We sustain Wiggins’s first issue.



Excluding evidence of Landry’s Lease
          In its first and second issues, JGI argues that the trial court erred in excluding
“any evidence of future damages associated with the parties’ contract and related to
the lease” between Wiggins and Landry’s and in denying its request for a continuance
“because the billboards were guaranteed to be in use for 40 years” under Wiggins’s
lease with Landry’s and “JGI was entitled to a portion of the revenue attributable to
the boards.” 
          During voir dire, JGI explained to the venire panel that, at trial, it would be
seeking 25% of the net revenues associated with the billboards for a 40-year term,
based upon the fact that it had obtained a copy of Wiggins’s lease with Landry’s and
had learned that the lease provided for monthly payments of $16,666 per month for
40 years. JGI further explained that it believed that it was entitled to a present value
figure of approximately $2.1 million, which it calculated to be 25% of the net
revenues from the billboards for the lease term. Following voir dire, Wiggins
objected to any attempt by JGI to introduce evidence of damages exceeding the
amounts disclosed in JGI’s responses to requests for disclosure, which were
approximately $151,000. The trial court sustained Wiggins’s objection, precluding
JGI from presenting evidence that it was entitled to future revenues for the 40 year
term set forth in the Landry’s lease. The trial court also denied JGI’s request for a
continuance.
          The record reveals that the trial court sustained Wiggins’s objection to JGI’s
attempts to introduce evidence that it sustained approximately $2 million in damages
on the ground that JGI had not timely supplemented its discovery responses to reflect
such a dramatic change in the damages it was seeking. A party may request
disclosure of “the amount and any method of calculating economic damages.” Tex.
R. Civ. P. 194.2(d). “A party who fails to make, amend, or supplement a discovery
response in a timely manner may not introduce in evidence the material or
information that was not timely disclosed, . . . unless the court finds that: (1) there
was good cause for the failure to timely make, amend, or supplement the discovery
response; or (2) the failure to timely make, amend, or supplement the discovery
response will not unfairly surprise or unfairly prejudice the other parties.” Tex. R.
Civ. P. 193.6(a). The party seeking to introduce the evidence bears the burden of
establishing good cause or the lack of unfair surprise or unfair prejudice, and such a
finding must be supported by the record. Tex. R. Civ. P. 193.6(b). The trial court has
the discretion to determine whether the party has met its burden. Brunelle v. TXVT
Ltd. P’ship, 198 S.W.3d 476, 477 (Tex. App.—Dallas 2006, no pet.). If a party
seeking to introduce the evidence fails to carry the burden, “the court may grant a
continuance or temporarily postpone the trial to allow a response to be made,
amended, or supplemented, and to allow opposing parties to conduct discovery
regarding any new information presented by that response.” Tex. R. Civ. P. 193.6(c).
          We hold that because JGI failed to meet its burden of establishing good cause
or the lack of unfair surprise or unfair prejudice, the trial court did not err in
excluding JGI’s damages evidence. Prior to voir dire, JGI never disclosed that it
would be seeking lost revenues of approximately $2 million based upon the argument
that it was entitled to share revenues for a deal spanning four decades. As explained
above, such an argument would have been contrary to the evidence that JGI and
Wiggins had, at most, an ongoing business arrangement for revenue sharing.


 The
evidence presented at trial provided no basis to support JGI’s argument that it was
entitled to seek damages based upon the 40-year model.


 Accordingly, we further
hold that the trial court did not abuse its discretion in denying JGI’s motion for
continuance.
          We overrule JGI’s first and second issues.
Conclusion
          We reverse the judgment of the trial court and render a take-nothing judgment
in favor of Wiggins.
 
 
                                                                        Terry Jennings
                                                                        Justice

Panel consists of Justices Jennings, Hanks, and Bland.