

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-21-00450-CV

**INTEGRITY PAIN MANAGEMENT, PLLC**,
Appellant/Cross-Appellee

v.

**DAVIS & ASSOCIATES MEDICAL CONSULTANTS, LLC**,
Appellee/Cross-Appellant

From the 408th Judicial District Court, Bexar County, Texas
Trial Court No. 2018-CI-23848
Honorable Aaron Haas, Judge Presiding

Opinion by:    Liza A. Rodriguez, Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Liza A. Rodriguez, Justice
Sandee Bryan Marion, Chief Justice (Ret.)[1]

Delivered and Filed: February 14, 2024

AFFIRMED

This appeal arises from a contractual dispute between Integrity Pain Management, PLLC ("Integrity Pain") and its billing service, Davis & Associates Medical Consultants, Inc. ("DAMC"). On appeal, Integrity Pain argues the evidence is legally and factually insufficient to support the trial court's findings that Integrity Pain breached the contract and that DAMC did not breach the contract. Integrity Pain also argues the evidence is legally and factually insufficient to support the trial court's award of monetary damages. Integrity Pain further argues the trial court

---

[1]Sitting by assignment pursuant to section 74.003(b) of the Texas Government Code

erred in imposing specific performance on the contract. Finally, DAMC raises a cross-issue: whether the trial court erred in failing to award attorney's fees to it under former section 38.001(a)(8) of the Texas Civil Practice and Remedies Code. We affirm.

## BACKGROUND

This case involves a contract dispute between Integrity Pain, a medical practice specializing in pain management, and DAMC, a medical billing company owned by accountant Jennifer Davis. On September 29, 2017, Integrity Pain and DAMC entered into a contract ("the 2017 Agreement"). Under the terms of this contract, DAMC agreed to "perform billing services on current claims," which "include[d] reviewing the charges and codes, processing the claims, posting payments, and following up on unpaid claims." DAMC was not responsible for handling any reductions in the bills or receiving any payments on the patients' accounts. Instead, under the 2017 Agreement, Integrity Pain agreed to be responsible for "handl[ing] reductions, including, but not limited to[,] reduction requests and tracking," and for receiving payments. Under the 2017 Agreement, payments were to "be received directly by [Integrity Pain] and deposited by [Integrity Pain] into [Integrity Pain]'s own bank account unless other arrangements are agreed upon."

DAMC was responsible for "monitor[ing] the payments from attorneys/carriers to determine that correct reimbursement is being made by the attorney/insurance company for services provided." DAMC's fee for providing billing services was six percent of the collections on the patients' accounts. Thus, the 2017 Agreement provided that DAMC would "invoice [Integrity Pain] for services provided for the prior month," and Integrity Pain was required to "remit 6% of all collections from third party carriers, insurance, attorneys, patients, etc.[,] to [DAMC]" by "pay[ing] [DAMC] the invoiced balance for billing/collection services within 10 days after being invoiced." Further, pursuant to the 2017 Agreement, DAMC was entitled to a "late fee of 2%" on "all late payments."

The 2017 Agreement further provided that during the term of the contract, Integrity Pain would not use "the services of any other claims processing person or companies and w[ould] allow [DAMC] to process all of [Integrity Pain]'s medical claims with the appropriate carriers/attorneys." Integrity Pain was required to "provide copies of all Explanation of Benefits (EOB) forms, reduction agreements and other documentation received from insurance payers/attorneys to [DAMC] as well as any records of payments received directly from the patient or any other source on a weekly basis."

Under the 2017 Agreement, DAMC agreed to "return delinquent accounts over to [Integrity Pain] for approval and then to a designated collections agency." However, such delinquent accounts were "still subject to [DAMC's] 6% collection fee due to the previous services rendered to the account." DAMC further agreed to use "HIPAA compliant software" and to "follow[] HIPAA privacy guidelines."

The term of the 2017 Agreement was for twelve months beginning on October 1, 2017. It automatically renewed "for a successive 12-month period unless terminated in writing by [Integrity Pain] with a 30-day notice." In the event of termination, "[a]ny monies/collections received by [Integrity Pain] for billing services performed prior to the termination date w[ould] be payable to [DAMC] at the agreed 6%." The 2017 Agreement explicitly stated that DAMC would "be paid for prior services performed even after a termination date." Finally, under the Agreement, DAMC had "the right to terminate this contract immediately for, but not limited to, [Integrity Pain] ceasing to perform any or all of the services mentioned above."

At the bench trial, there was evidence that most of the claims for which DAMC provided billing services to Integrity Pain were for treatment of personal-injury claimants. For these personal-injury claimants, Integrity Pain had received letters of protection from personal-injury attorneys. For the patients who were not under letters of protection and had health insurance, their

claims were submitted to health insurance companies. The health insurance companies typically paid health insurance claims within forty-five days and required no follow-up. However, payment of claims relating to patients with letters of protection were dependent upon the completion of their claim—either through settlement or a favorable result at trial. Thus, payment of the bills for personal-injury patients could take months or years. Further, when settling claims, attorneys representing the personal-injury patients would seek reduction of the patient's charges with Integrity Pain; such reductions to the billed charges could include up to fifty percent of the total billed amount. Under the 2017 Agreement, all reduction requests from attorneys were handled by Integrity Pain, and all payments were sent to Integrity Pain.

Because all payments were sent to Integrity Pain, the 2017 Agreement required Integrity Pain to inform DAMC, on a weekly basis, how much it had collected and on which accounts it had collected payments. Using the information provided by Integrity Pain, DAMC then posted the payments and prepared its monthly invoice to Integrity Pain for its six-percent commission based on those collections. Then, under the 2017 Agreement, Integrity Pain was required to pay DAMC within ten days.

On October 2, 2018, DAMC sent Integrity Pain an invoice in the amount of $19,676.90, which was based on Integrity Pain's September 2018 collections. On October 5, 2018, Integrity Pain's Director of Business Development, Ashley Poligala, sent an email to DAMC, stating that Integrity Pain was "in the process of auditing" its "billing" and had "hired a consultant to look for ways [it could] improve [its] reimbursements for 2019." Poligala requested from DAMC information relating to (1) "Primary Insurance Aging for all LOP [Letter of Protection] and Private Insurance Patients," and (2) "[a]ll patient ledges of all outstanding acc[ounts] including patient statements." Poligala stated that Integrity Pain would "like to have copies of these items in PDF form by the end of next week so [it could] be[gin] the process the week after." DAMC's owner,

Jennifer Davis, testified that she attempted to comply with the request but had software problems in attempting to compile such a large amount of information. She testified she tried to reach Poligala by telephone to clarify the information Integrity Pain needed for its audit. However, Poligala failed to return any of her telephone calls.

Integrity Pain's sole owner and medical director, Dr. Kerry Latch, testified that in late September 2018, he contacted a new billing company, Progressive Medical Billing ("Progressive").[2] He testified he was concerned about the amount of collections and began looking into DAMC's practices of billing and following up on collections. According to Dr. Latch, Integrity Pain thus started the process of trying to hire a consultant to improve collection of payments for the work performed. To do so, Integrity Pain needed to obtain data from DAMC. Thus, Poligala requested via email specific records from DAMC.

On October 11, 2018, Davis responded to Poligala through email and complained about Integrity Pain's lack of transparency and communication: "Considering the lack of transparency and lack of communication we have had with you, as your billing service, it is considered incongruous for our business relationship to provide you with the requested information at this time." She stated that "[a]n honest and truthful conversation and meeting needs to occur to discuss any misapprehensions and other items." Davis noted that they had a meeting already scheduled on October 29, 2018, but stated that "if a meeting need[ed] to take place sooner," Integrity Pain should let her know.

On October 12, 2018, Poligala responded via email stating that Davis's response had put Integrity Pain in a "difficult position" and that "[i]f anyone ha[d] been non-transparent it w[as]

---

[2]Richard Hernandez, Progressive's administrator, testified as a fact witness that Integrity Pain first contacted Progressive in August 2018 about billing services. According to Hernandez, Progressive was not informed by Integrity Pain that it had an exclusive billing agreement with DAMC.

[Davis]" by refusing to provide the "requested access to [Integrity Pain's] patient billing information." Poligala then accused Davis of "creat[ing] disturbances in [Integrity Pain's] practices by pointing out errors without explanation" and making Integrity Pain "do the research to find answers for issues that [Davis], as a professional biller and coder, should know." Poligala stated that she had "received countless complaints from referring attorneys, patients, and staff regarding [Davis's] customer service and attitude." Poligala stated that "[a]t this point, [Davis had] breached [the] contract and [Integrity Pain] fe[lt] it may be best to terminate this relationship altogether." Poligala demanded "the requested information by the end of" the business day. If she did not receive the requested information, she warned Davis to "expect a letter from [Integrity Pain's] attorney regarding the matter."

That same day, Davis responded to the email and denied the accusations made by Poligala. She emphasized that DAMC had worked with Integrity Pain (as its predecessor SADI-Pain Management) for fifteen years and had "been an integral component in the growth of the practice." Davis also denied that DAMC had breached the 2017 Agreement, noting that the "items listed in the contract ha[d] been performed." Davis pointed out that the "release of 'all patient statements' is not addressed in the contract." Davis explained that "[f]urther discussion [would] need to take place regarding [Integrity Pain]'s request and the time and fees associated with this request." Davis noted that if Integrity Pain intended to terminate the 2017 Agreement, it needed to do so in compliance with its terms. Further, Davis explained that "further discussion need[ed] to take place concerning future payments on all outstanding accounts for services that have already been provided by [DAMC], per [the] contract." Finally, Davis stated that DAMC had sent its invoice to Integrity Pain on October 2, 2019, and payment had not been received in compliance with the 2017 Agreement.

On October 15, 2018, Poligala responded via email, complaining of Davis using "out of date" "codes," which were "likely the culprit for the timeliness of reimbursement (or lack thereof) on insurance bills." Poligala further stated that the information requested "is owned by" Integrity Pain and "will be provided." According to Poligala, there was nothing in the 2017 Agreement that "addresses any additional 'fees' other than what [DAMC is] entitled to during [its] wind-up period." "There is no clause requiring a face-to-face meeting." Poligala further stated that she had been "given explicit instructions to hold all further payments to [DAMC] until the requested information is received." She warned Davis that Davis could "not hold our billing information hostage in an effort to drag out a wind-up period." Poligala ended her email stating, "Due to [Davis's] lack of cooperation in assisting with a simple audit, [DAMC's] services will no longer be needed."

On October 15, 2018, Integrity Pain signed a new billing-services contract with Progressive.

On October 17, 2018, Davis responded to Poligala, stating that DAMC's "goal [was] to make termination of the services between [the two offices] run smoothly." Davis noted that the September 2018 invoice was past due. Further, she noted that pursuant to the 2017 Agreement, "all future monies received by [Integrity Pain], on behalf of the work performed by [DAMC], will need to be paid as well." "Future account receivables, in which [DAMC's] contracted fee applies to, will be paid to [Integrity Pain] throughout many years in the future due to the nature of personal injury cases." "To post the future account receivables accurately . . . will require open communication and [Integrity Pain] sending [DAMC] the proper payment information in a prompt manner."

Davis stated that if Integrity Pain wanted "to completely sever the relationship altogether," they could "negotiate a possible settlement of all future monies to be received and owed to

[DAMC]." With regard to Integrity Pain's request for information, Davis replied that "[t]he request for all outstanding patient statements is something that may be provided to physician offices, at a fee, upon termination of a billing contract." Davis explained that DAMC had provided services to Integrity Pain for fifteen years, which had "created a very large volume of outstanding accounts due to the personal injury cases." Davis stated she hoped to resolve these disputes "short of formal legal action" but if they could not agree "on the issues currently in dispute," DAMC would "be obligated to involve [its] attorney."

On October 22, 2018, DAMC's attorney sent Integrity Pain a demand letter, stating that Integrity Pain had "ceased to timely perform certain . . . obligations to [DAMC]" under the 2017 Agreement, "including, but not limited to, providing records of payments received from any source on a weekly basis under Paragraph G thereof." The letter further stated that "[f]or this reason and other reasons," DAMC was "exercise[ing] its right, pursuant to Paragraph N," to terminate the 2017 Agreement "effective as of 5:00 p.m. on Friday, October 26, 2018 (the 'Termination Date')." The letter advised Integrity Pain that "under Paragraph K" of the 2017 Agreement, DAMC was "entitled to be paid by [Integrity Pain] for all billing services performed on or before the Termination Date, including based on collections received by [Integrity Pain] after the Termination Date." The letter then stated that Integrity Pain owed $19,676.90 to DAMC for billing services performed and collected in September 2018 under the 2017 Agreement. With the late fee, Integrity Pain owed $20,070.44 for the month of September 2018. On October 26, 2018, Integrity Pain paid the September 2018 invoice and late fee. However, it withheld weekly reports of payments it collected from DAMC, which prevented DAMC from invoicing Integrity Pain for its billing services.

On or about November 14, 2018, DAMC and Integrity Pain entered into an agreement, which was memorialized in a letter (the "Letter Agreement"). "In order to reach a mutually

agreeable resolution," DAMC and Integrity Pain agreed to the following with regard to the 2017 Agreement:

1. At or before 3:00 p.m. CST on Thursday, November 15, [2018], [DAMC] will provide [Integrity Pain] in electronic format (through hand delivery to the above address [] a password-protected flash drive with an enclosure letter providing the password) all the insurance patient billing information and personal injury/lawyer referral case billing information requested in [Integrity Pain's] email correspondence of November 1, 2018.

2. [Integrity Pain] acknowledges and affirms its obligations under the Agreement to pay [DAMC] for all billing services that [DAMC] performed prior to the October 26, 2018 termination of the Agreement based on collections received by [Integrity Pain] either before or after this date, including its obligation to provide to [DAMC] all accounts receivable information necessary for [DAMC] to invoice [Integrity Pain] based on such collections. Save for and except such payments which are unearned as a result of billing practices that [Integrity Pain] determined in good faith were improper. [Integrity Pain] shall provide [DAMC] proof of any and all accounts that [Integrity Pain] determined in good faith were required to be re-worked due to such billing practices.

DAMC timely provided Integrity Pain with a flash drive containing all the requested billing information. Integrity Pain, however, continued to withhold weekly payment records from DAMC. At that time, Integrity Pain offered no justification for withholding the records. It did not provide any proof to DAMC that any payment to DAMC was "unearned" due to "improper" billing practices or that any accounts "were required to be re-worked due to such practices."

On November 27, 2018, DAMC's counsel sent another letter to Integrity Pain's counsel, demanding that the withheld weekly payment records for October and November 2918 be delivered to DAMC by December 6, 2018. On December 6, 2018, Integrity Pain's counsel required more time to deliver the records. DAMC's counsel offered to extend the deadline to December 11, 2018, if Integrity Pain provided the two additional weeks that would be due by December 11, 2018. Integrity Pain's counsel never responded, and Integrity Pain did not provide the payment records to DAMC.

On December 20, 2018, DAMC sued Integrity Pain for breach of contract and requested specific performance. Integrity Pain countersued for breach of contract, negligence, and fraud. After a bench trial, the trial court found in favor of DAMC's breach of contract claim and awarded a total of $270,142.35 in damages. The trial court further ordered specific performance of Integrity Pain's obligation to, on a weekly basis, review all its collections for the week, compare them to the accounts in Plaintiff's Exhibits 34-37, determine if any of those collections apply to those accounts, and then send that information to DAMC so that it could invoice Integrity Pain for its six percent commission. Integrity Pain appealed.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

In support of its judgment, the trial court found that DAMC and Integrity Pain entered into a contract for billing services on January 1, 2013 and October 1, 2017. It found that two contracts contained "essentially the same terms," except that the 2013 Agreement provided "for a commission of seven percent (7%) on all collections" and did not provide that Integrity Pain would "handle reduction requests and tracking or that" Integrity Pain would "provide copies of reduction agreements to [DAMC.]" The trial court found that during the term of the 2013 Agreement and during the initial term of the 2017 Agreement,

- DAMC "rendered billing services on all of [Integrity Pain]'s current claims, and [Integrity Pain] provided on a weekly basis to [DAMC] all records of the payments received by [Integrity Pain], including sending a spreadsheet listing each of the payments received by [Integrity Pain] during the previous week, and also mailing copies of checks, reduction agreements, Explanation of Benefits, and other supporting documents for each payment"; and

- DAMC sent Integrity Pain "statements on a monthly basis for the commission based on the payments received by [Integrity Pain] on the claims during the previous month, and [Integrity Pain] paid in full to [DAMC] all statements for the commission."

The trial court further made the following findings of fact:

FOF 7: Integrity Pain "did not provide any written notice of termination of the 2017 Agreement to DAMC on or before September 1, 2018," and thus the "2017 Agreement renewed for an additional period of twelve (12) months beginning on October 1, 2018."

FOF 8: "On or about October 2, 2018, [DAMC] sent [Integrity Pain] a statement in the amount of $19,676.90 for the six percent (6%) commission on payments totaling $327,948.31 received by [Integrity Pain] in September 2018 on claims for which [DAMC] rendered billing services to [Integrity Pain]."

FOF 9: "Beginning on or about October 8, 2018, [Integrity Pain] ceased providing to [DAMC], on a weekly basis or otherwise, all records of the payments received by [Integrity Pain] from any source."

FOF 10: "On or about October 22, 2018, [DAMC] sent [Integrity Pain] a written notice of termination of the 2017 Agreement effective as of 5:00 p.m. on October 26, 2018, as well as a written demand that [Integrity Pain] remit payment for the October 2, 2018 Statement on or before October 31, 2018."

FOF 11: Integrity Pain "did not pay the October 2, 2018 Statement within ten (10) days, but on or about October 30, 2018, [Integrity Pain] remitted payment in full for the October 2, 2018 Statement, including payment of the two percent (2%) late fee of $393.54."

FOF 12: "On or about November 14, 2018, [DAMC] and [Integrity Pain], through their respective counsel, entered into a Letter Agreement dated November 8, 2018."

FOF 14: "On November 15, 2018, [DAMC] delivered to [Integrity Pain], through its counsel, the [DAMC] Aging Report for [Integrity Pain] (the 'Aging Report')," which included "the outstanding claims of [Integrity Pain]," and the DAMC "Statements of Account for [Integrity Pain], including statements for all outstanding accounts of" Integrity Pain.

FOF 15: "On or about November 27, 2018, [DAMC] sent [Integrity Pain], through its counsel, a written demand that [Integrity Pain] provide to [DAMC] on or before December 6, 2018, all records of the payments received by [Integrity Pain] on the claims for all weeks from October 8, 2018 to November 25, 2018, and also that [Integrity Pain] remit payment to [DAMC] for the amounts invoiced by [DAMC] within ten (10) days of the date of each such invoice."

FOF 16: "On December 6, 2018," Integrity Pain, "through its counsel, acknowledged receipt of the November 27, 2018 demand letter and also

requested an extension of time to provide the requested records of payments described above."

FOF 17: "Beginning on or about October 18, 2018," Integrity Pain "ceased providing to [DAMC] any records of the payments received by [Integrity Pain] on the claims, which prevented [DAMC] from posting such payments, from following up on any unpaid claims, from calculating the commission on such payments, and from sending a statement to [Integrity Pain] for any month from October 2018 forward."

FOF 18: Integrity Pain "did not provide [DAMC] proof of any accounts that [Integrity Pain] determined in good faith were required to be re-worked due to improper billing practices."

FOF 19: "From October 2018 through mid-December 2020, [Integrity Pain] received payments totaling $4,146,101.60 on the claims for which [DAMC] provided billing services to [Integrity Pain], as reflected in the spreadsheets and documents in Plaintiff's Exhibits P40 through P-130 and the Summary Spreadsheet."

FOF 20: "A six-percent (6%) commission on the payments totaling $4,146,101.60 described above is $248,766.09, and [Integrity Pain] has not paid any commission at all to [DAMC] for such payments."

FOF 21: "After applying the payments totaling $4,146,101.60 described above, the balance on the Aging Report for [Integrity Pain] is $3,317,407.04."

FOF 22: "The further commission on the payments that [Integrity Pain] has received and will receive from mid-December 2020 forward cannot be calculated until such payments are received by [Integrity Pain] and records of such payments are provided to [DAMC]."

FOF 23: DAMC "is ready, willing, and able to perform its obligations under the 2017 Agreement and the Letter Agreement."

In applying the above findings of fact, the trial court concluded the following:

COL 1: "The 2017 Agreement and the Letter Agreement are valid and enforceable contracts between [DAMC] and [Integrity Pain].

COL 2: DAMC "performed or substantially performed its obligations under the 2017 Agreement and the Letter Agreement and did not breach either contract."

COL 3: Integrity Pain "materially breached its obligations under the 2017 Agreement and the Letter Agreement by failing to timely pay the October 2, 2018 Statement and by failing to provide to [DAMC], on a weekly basis,

all records of payments received by [Integrity Pain] on the claims for which [DAMC] rendered billing services to [Integrity Pain].

COL 4: "By refusing, despite demand, to timely provide the records described above, [Integrity Pain] prevented [DAMC] from performing under the 2017 Agreement and the Letter Agreement."

COL 7: "By refusing, despite demand, to timely provide the records described above, [Integrity Pain] anticipatorily repudiated its obligations under the 2017 Agreement and the Letter Agreement to provide, on a weekly basis, all records of payments that [Integrity Pain[ has received and will receive on the claims for which [DAMC] rendered billing services to [Integrity Pain] and to pay to [DAMC] the commission based on such payments."

## STANDARD OF REVIEW

"A trial court's findings of fact issued after a bench trial have the same weight, and are judged by the same appellate standards, as a jury verdict." *Tex. Outfitters Ltd. v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019). A challenge to the legal sufficiency of a trial court's finding of fact "fails if more than a scintilla of evidence supports the finding." *Id*. In conducting a legal-sufficiency review of the evidence, we view the evidence in the light most favorable to the trial court's findings of fact and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). As long as the evidence at trial "would enable reasonable and fair-minded people to differ in their conclusions," we will not substitute our judgment for that of the factfinder, as the factfinder is the sole judge of witness credibility and the weight to give to testimony. *Id*.

When reviewing a challenge to the factual sufficiency of a trial court's finding of fact, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998); *Arshad v. Am. Express Bank, FSB*, 580 S.W.3d 798, 803 (Tex. App.—Houston [14th Dist.] 2019, no pet.). "When a party challenges the factual sufficiency of the evidence supporting a finding for which it did not have the burden of proof, we set aside the verdict only if it is so contrary to the

overwhelming weight of the evidence as to be clearly wrong and unjust." *Arshad*, 580 S.W.3d at 803 (citing *Ellis*, 971 S.W.2d at 407). "We may not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence." *Arshad*, 580 S.W.3d at 803 (citing *Ellis*, 971 S.W.2d at 407). "The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment." *Id*.

"An appellant may not challenge a trial court's conclusions of law for factual sufficiency, but we may review the legal conclusions drawn from the facts to determine their correctness." *Id*. (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)). "If the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal." *Marchand*, 83 S.W.3d at 794.

## SUFFICIENCY OF THE EVIDENCE

To establish a claim for breach of contract, a plaintiff must prove the following elements: (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Arshad*, 580 S.W.3d at 804. In its first issue, Integrity Pain argues the trial court erred in concluding that Integrity Pain breached the 2017 Agreement and Letter Agreement in two ways: (1) by failing to provide to DAMC on a weekly basis all records of payments received by Integrity Pain on the claims for which DAMC rendered billing services to Integrity Pain (COL 3); and (2) by refusing, despite demand, to timely provide the records and thus preventing DAMC from performing under the 2017 Agreement and Letter Agreement (COL 4). Integrity Pain further argues the trial court erred in concluding that DAMC performed or substantially performed its obligations under the 2017 Agreement and the Letter Agreement and did not breach either contract (COL 2). In support of these arguments, Integrity Pain challenges the legal and factual sufficiency of the evidence to support the following findings of fact made by the trial court: (1) on or about October 18, 2018,

Integrity Pain ceased providing records of payments that prevented DAMC "from posting such payments, from following up on any unpaid claims, from calculating the commission on such payments, and from sending a statement to [Integrity Pain] for any month from October 2018 forward" (FOF 17); (2) DAMC "is ready, willing and able to perform its obligations under the 2017 Agreement and Letter Agreement" (FOF 23); and (3) Integrity Pain received payments from October 2018 to mid-December 2020 in the amount of $4,146,101.60 on claims DAMC "provided billing services" to Integrity as reflected in Plaintiff's Exhibits 40-130 and summarized in Plaintiff's Exhibit 131 (FOF 19).

### A. The Trial Court's Conclusions of Law 3 & 4 and the Sufficiency of the Evidence to Support the Findings Made by the Trial Court That Support Those Conclusions

As noted, Integrity Pain argues the trial court erred in concluding that it breached the 2017 Agreement and Letter Agreement (1) by failing to provide to DAMC on a weekly basis all records of payments received by Integrity Pain on the claims for which DAMC rendered billing services to Integrity Pain (COL 3); and (2) by refusing, despite demand, to timely provide the records and thus preventing DAMC from performing under the 2017 Agreement and Letter Agreement (COL 4). The linchpin of Integrity Pain's argument is its interpretation of "billing services" as provided for in the 2017 Agreement and Letter Agreement. According to Integrity Pain, "billing services" means *all billing services*, including reviewing the charge codes, processing the claims, posting payments, following up on unpaid claims, monitoring payments from the attorneys/carriers to determine correct reimbursement, and returning delinquent accounts over to Integrity Pain for approval and then to a designated collection agency. Integrity Pain argues that unless there is legally and factually sufficient evidence to show DAMC performed *all billing services* on claims before the October 26, 2018 termination date, DAMC was not entitled to six percent of collections. Specifically, Integrity Pain argues that under the terms of the 2017 Agreement and the Letter

Agreement, after DAMC terminated the contract, DAMC was entitled only to collections received on claims for which it had performed *all billing services* before the termination date. That is, Integrity Pain contends that nowhere in the 2017 Agreement or Letter Agreement did the parties agree that DAMC would continue to perform any kind of billing service after October 26, 2018. Integrity Pain argues that once DAMC terminated the contract and failed to complete *all billing services* on pending claims, DAMC was not entitled to six percent of those collections—even if it had previously sent out a bill before October 26, 2018. Integrity Pain stresses that there is no evidence that DAMC performed *all billing services* on the pending claims when the contract terminated on October 26, 2018. Integrity Pain further argues that because DAMC was no longer performing billing services after the termination date, Integrity had no duty to provide any records to DAMC. Similarly, Integrity Pain argues that it did not prevent DAMC from continuing to perform billing services and that DAMC's termination of the agreement is what prevented it from continuing to perform billing services.

In response, DAMC argues that Integrity Pain has misconstrued the plain language found in the 2017 Agreement and the Letter Agreement and that Integrity Pain's interpretation would render the Letter Agreement meaningless. DAMC points out that the 2017 Agreement does not state that DAMC would be paid after termination of the contract only for accounts for which DAMC had performed *all* of the tasks that could be considered "billing services." DAMC emphasizes that "billing services" is not a defined term in the 2017 Agreement, nor does the phrase "all billing services" appear anywhere in the 2017 Agreement. DAMC argues that Integrity Pain's "strict interpretation" of "billing services" has no support in the language of the 2017 Agreement.

"In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). "To achieve this objective, courts should examine and consider the

entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id*. "Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Id*. Further, in construing a contract, "'objective, not subjective, intent controls,' so the focus is on the words the parties chose to memorialize their agreement." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 757 (Tex. 2018) (quoting *Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006)). While "[s]urrounding facts and circumstances can inform the meaning of language," they "cannot be used to augment, alter, or contradict the terms of an unambiguous contract." *Id*. at 758. "A contract's plain language controls, not 'what one side or the other alleges they intended to say but did not.'" *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017) (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010)). A reviewing court thus "assign[s] terms their ordinary and generally accepted meaning unless the contract directs otherwise." *Id*. "If the language lends itself to a clear and definite legal meaning, the contract is not ambiguous and will be construed as a matter of law." *Id*. "An ambiguity does not arise merely because a party offers an alternative conflicting interpretation, but only when the contract is actually 'susceptible to two or more reasonable interpretations.'" *Id*. (quoting *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)). That the parties may disagree about the meaning of a contract does not create an ambiguity. *See id*.

Paragraph K of the 2017 Agreement provides the following:

Any monies/collections received by the client *for billing services performed prior to the termination date* will be payable to [DAMC] *at the agreed 6%.* (See C & H above)[.] [DAMC] *will be paid for prior services performed even after a termination date*.

(emphasis added). Paragraph C, in turn, provides:

> [DAMC] will invoice [Integrity Pain] *for services provided for the prior month*. [Integrity Pain] will *remit 6% of all collections from third party services, insurance, attorneys, patients, etc.* to DAMC and agrees to pay DAMC the invoiced balance *for billing/collection services* within 10 days after being invoiced. A late fee of 2% will be charged on all late payments.

(emphasis added). Paragraph H states that DAMC "will return delinquent accounts over to [Integrity Pain] for approval and then to a designated collection agency. These accounts *are still subject to [DAMC] 6% collection fee due to the previous services rendered to the account*." (emphasis added).

The above language of the 2017 Agreement uses the terms "billing services" and "services" interchangeably and provides that DAMC will be paid for "prior services performed after a termination date." Further, Paragraph K states that Paragraphs C and H will apply to these "billing services performed prior to the termination date" that DAMC must be paid for these services at the six-percent commission rate. Paragraph C, in turn, refers to the process by which DAMC invoices Integrity Pain for six percent of the total amount collected on prior bills sent—a process DAMC can perform only if Integrity Pain sends it the information regarding payments received on past-billed accounts pursuant to Paragraph G. Similarly, Paragraph H refers to the process by which DAMC informs Integrity Pain about the accounts that are delinquent and should be sent to a collection agency—a process again that DAMC can perform only if it receives the relevant information from Integrity Pain regarding payments received on past-billed accounts under Paragraph G. That the 2017 Agreement explicitly refers to the processes described in Paragraphs C and H, and implicitly refers to the process described in Paragraph G, indicates that Paragraph K does not merely refer to accounts on which *all billing services* had already been performed before the termination date. We agree with DAMC that adopting Integrity Pain's "interpretation of the Agreement would render the termination provisions of the Agreement meaningless and nonsensical." *See Valence*, 164 S.W.3d at 662 (explaining that in construing a contract, a court

examines and considers the entire contract in an effort to harmonize and give effect to all of the contract's provisions so that none will be rendered meaningless).

In addition, in the November 8, 2018 Letter Agreement, the parties reaffirmed the process after the termination date of the 2017 Agreement:

> [Integrity Pain] acknowledges and affirms its obligations under the [2017] Agreement to pay [DAMC] for all billing services that [DAMC] performed prior to the October 26, 2018 termination of the Agreement *based on collections received by* [Integrity Pain] *either before or after this date*, including its obligation to provide to [DAMC] all accounts receivable information necessary for [DAMC] to invoice [Integrity Pain] based on such collections. Save for and except such payments which are *unearned as a result of billing practices that [Integrity Pain] determined in good faith were improper*. [Integrity Pain] shall provide [DAMC] proof of any and all accounts that [Integrity Pain] determined *in good faith were required to be re-worked due to such billing practices*.

(emphasis added). Thus, like the 2017 Agreement, the Letter Agreement discusses the process by which Integrity Pain would continue to provide DAMC, even after the termination date, all information relating to payments received on accounts DAMC had provided services so that DAMC could invoice Integrity Pain and collect the six-percent commission fee. The only explicit exception to Integrity Pain paying DAMC its six-percent commission fee on previously billed accounts was if Integrity Pain determined *in good faith* that the bills in question had to be *re-worked due to improper billing practices*. The trial court's findings relevant to these provisions harmonize all provisions of the 2017 Agreement and the Letter Agreement. In contrast, Integrity Pain's strict interpretation renders the termination provisions in both the 2017 Agreement and the Letter Agreement meaningless.

Further, the evidence at trial showed that the majority of patients treated by Integrity Pain were under letters of protection relating to their personal-injury claims. Because those clients' bills could not paid until their personal-injury claims were completed, some bills were not paid for years. Thus, under Integrity Pain's strict interpretation, DAMC could perform billing services

work for years and then receive nothing when Integrity Pain finally received payment on the previously billed accounts after the termination date of the agreement—simply because it took years for the patients' personal-injury claims to be resolved. Given this context that the majority of Integrity Pain's patients were being treated under letters of protection relating to their personal-injury claims, we disagree with Integrity Pain's strict interpretation of the termination provisions in the 2017 Agreement and Letter Agreement. *See URI, Inc.*, 543 S.W.3d at 758 (explaining that "[s]urrounding facts and circumstances can inform the meaning of language" in a contract). We therefore reject Integrity Pain's strict interpretation of the 2017 Agreement and Letter Agreement and find no error by the trial court in determining that Integrity Pain continued to have obligations to send information to DAMC about payments received on past-billed accounts.

Because we have rejected Integrity Pain's strict interpretation of the 2017 Agreement and Letter Agreement, Integrity Pain's sufficiency issues necessarily fail too. Integrity Pain's sufficiency arguments relied on our adoption of its strict interpretation of the 2017 Agreement and Letter Agreement. However, as we have rejected that strict interpretation, the evidence is legally and factually sufficient to support the challenged fact findings. Davis testified at trial that after the termination date, Integrity Pain refused to provide weekly payment records to DAMC as required by Paragraph G. Davis testified at trial that because Integrity Pain handled all reduction requests and received all payments, without this information, she could not post payments or follow up on unpaid claims. Davis testified that unless Integrity Pain sent DAMC this weekly report, she had no way of knowing which billings Integrity Pain had agreed to reduce or which accounts had received payments. By refusing to provide the weekly reports to DAMC, Integrity Pain prevented DAMC from posting payments, from following up on unpaid claims, and from invoicing Integrity Pain for the 6% fee. Because Integrity Pain was obligated under the contract, as it affirmed in the Letter Agreement, to provide weekly payment records and pay to DAMC the commission based

on payments received both before and after termination, the trial court correctly found that Integrity Pain's failure to provide the payment records to DAMC was both a breach and anticipatory repudiation of the Agreement and the Letter Agreement. Therefore, we hold the findings challenged by Integrity Pain were supported by legally and factually sufficient evidence.

### B. The Trial Court's Conclusion of Law 2 and the Sufficiency of the Evidence to Support Findings Made by the Trial Court

Integrity Pain further argues the trial court erred in concluding that DAMC performed or substantially performed its obligations under the 2017 Agreement and the Letter Agreement and did not breach either contract (COL 2). According to Integrity Pain, the evidence conclusively proved that DAMC breached the 2017 Agreement before any alleged breach committed by Integrity Pain. When a party attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the evidence establishes all vital facts in support of the issue as a matter of law. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *SW Loan A, L.P. v. Duarte-Viera*, 487 S.W.3d 697, 701 (Tex. App.—San Antonio 2016, no pet.). "In performing a legal sufficiency review, we must first examine the record for evidence that a reasonable factfinder would credit as supporting the finding while ignoring all evidence to the contrary unless a reasonable factfinder could not." *SW Loan A*, 487 S.W.3d at 701 (citing *City of Keller*, 168 S.W.3d at 827, and *Dow Chem.*, 46 S.W.3d at 241). "If there is no evidence to support the finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law." *Id*. (citing *Dow Chem.*, 46 S.W.3d at 241). "The point of error should be sustained only if the contrary proposition is conclusively established." *Dow Chem.*, 46 S.W.3d at 241. "Evidence is conclusive only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case." *City of Keller*, 168 S.W.3d at 816. "We consider the evidence in the light most favorable to the finding under review and

indulge every reasonable inference that would support it." *SW Loan A*, 487 S.W.3d at 702 (citing *City of Keller*, 168 S.W.3d at 822). We assume the factfinder "decided questions of credibility or conflicting evidence in favor of the finding if they reasonably could do so." *Id.* (citing *City of Keller*, 168 S.W.3d at 819).

When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, the party must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 242. In conducting our factual sufficiency review, we consider and weigh all the evidence and set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

Integrity Pain first argues DAMC breached the 2017 Agreement by "failing to perform all 'billing services.'" This argument is based on Integrity Pain's strict interpretation of the 2017 Agreement and Letter Agreement that we have rejected.

Next, Integrity Pain argues DAMC breached the 2017 Agreement first by refusing to provide Integrity with the documents requested by Ashley Poligala by email on October 5, 2018. Integrity Pain argues Poligala requested these documents so a consultant could review and help improve reimbursements. However, the 2017 Agreement has no language relating to any obligation of DAMC to provide such documents to Integrity Pain. Dr. Latch acknowledged in his deposition testimony, which was admitted in evidence, that no language in the 2017 Agreement required DAMC to comply with the request of these documents. Further, there was evidence at trial that DAMC did provide the requested information to Integrity Pain in electronic form on November 15, 2018, as agreed by the parties in the Letter Agreement. Thus, even if the 2017 Agreement did require DAMC to provide the requested information before November 15, 2018, Integrity Pain agreed in the Letter Agreement to accept such information. If a non-breaching party

to a contract "continues to insist on performance by the party in default, the previous breach by the breaching party is not an excuse for nonperformance by the non-breaching party and the contract continues in full force." *Mobilelink San Antonio, LLC v. PNK Wireless Commc'n Inc.*, No. 01-15-01048-CV, 2016 WL 7368066, at *2 (Tex. App.—Houston [1st Dist.] Dec. 20, 2016, no pet.).

Third, Integrity Pain argues DAMC breached the 2017 Agreement by failing to comply with HIPAA. Paragraph 1 of the 2017 Agreement provided that DAMC "uses HIPAA compliant software and follows HIPAA privacy guidelines." Integrity Pain argues that "the evidence at trial was clear that Davis was not using HIPAA compliant software and did not follow HIPAA privacy guidelines." However, Integrity Pain does not point to any expert testimony to show this fact; it instead relies on the lay testimony of both Davis and Dr. Latch. It points out that Davis testified she used email through Guadalupe Valley Electrical Company ("GVEC"), which was her home web or internet provider. She further testified she did not have control over GVEC's servers or know where those servers were located. Integrity Pain also points to Dr. Latch's testimony that during the time DAMC performed billing services for Integrity Pain, Davis sent annual emails stating DAMC was using HIPAA compliant methods to store and bill Integrity Pain's data.

In response, DAMC argues the trial court as fact finder could have believed Davis's testimony that DAMC was compliant with HIPAA. *See City of Keller*, 168 S.W.3d at 827. Davis testified that when Professional Billing Services became DAMC, she took over the role as HIPAA compliance officer. Davis testified she had training on HIPAA compliance and experience from working with a compliance officer in the past. Davis testified she reviewed HIPAA and became familiar with its requirements and guidelines by looking at the federal Health and Human Services website. DAMC then implemented a policy and procedure plan. DAMC did not hire a third party to confirm HIPAA compliance. When asked what DAMC did to ensure HIPAA compliance

through email communications, Davis testified that when DAMC first was created, nothing was sent by email; everything was sent through a fax machine. Around 2016, DAMC sent protected health information by email over GVEC servers. Davis testified that to ensure the email was HIPAA compliant, when information was sent via email, DAMC "use[d] an encryption software so that [the information] was encrypted." When information was sent to DAMC, Davis "would either print and delete the emails, or [she] would save them to [DAMC]'s internal database and then delete the emails." Davis testified it was "more than likely" the GVEC servers were not HIPAA compliant, but she testified DAMC used procedures to protect the information, such as deleting the emails DAMC received as quickly as possible. Integrity Pain points to Davis's testimony where she admitted that between the time DAMC received the email and the time Davis deleted the email, it was possible for a hacker to access the email. However, Davis was adamant that DAMC's process complied with HIPAA. Further, Davis testified that because Integrity Pain was sending DAMC the emails in question with the protected information, it was Integrity Pain's obligation to keep the information secure. Davis testified, "Any provider that sends information should make sure that the information they send is protected." Davis testified DAMC had no control of whether the emails they received were encrypted or password-protected.

In support of its argument that DAMC did not comply with HIPAA, Integrity Pain points to an email breach in February 2019 where thirty patients' protected health information could have been exposed through DAMC's email. Davis testified that in February 2019, she received "a suspicious email" and was not sure whether it was a breach of security. The email "had a link on it that it wanted [her] to click on." She testified DAMC followed its "compliance program of handling it as a breach because we weren't sure the substance of the email, so we followed the steps of our compliance program." She testified DAMC was "just being overly cautious" by treating "it as a breach." She testified she was the only employee of DAMC at the time, and she

did not click on the link of the suspicious email. According to Davis, DAMC's compliance program required "contacting the appropriate sources that would have been involved." Davis notified the United States Secretary of Health and Human Services through its online system and notified the thirty individuals who were possibly affected. DAMC never received a response from Health and Human Services. Davis testified there has never been any indication anyone was harmed as a result of the suspicious email received by DAMC. Again, Integrity merely points to the lay testimony of Davis and Dr. Latch. Davis testified DAMC complied with HIPAA. There is no expert testimony to contradict her assertions. Dr. Latch merely testified that DAMC represented that it was in full compliance with HIPAA and that he would not have hired DAMC if he had known DAMC was not compliant. As factfinder, the trial court was free to find Davis's testimony on the issue credible. *See City of Keller*, 168 S.W.3d at 827.

For the reasons stated above, we hold the evidence is legally and factually sufficient to support the trial court's findings that DAMC did not breach either the 2017 Agreement or Letter Agreement and that Integrity Pain did breach the 2017 Agreement and Letter Agreement by failing to provide DAMC weekly records of payments received by Integrity Pain on the claims for which DAMC had rendered billing services to Integrity Pain.[3]

<h3 style="text-align:center">SUFFICIENCY OF AWARD OF DAMAGES</h3>

Integrity Pain argues that because there is "no evidence or insufficient evidence provided that [DAMC] performed all of the 'billing services' under the contract for the collections it claimed 6% entitlement to, there [is] also no evidence or insufficient evidence to support the damages award." Integrity Pain points to evidence that the company it hired to perform billing services after

---

[3]Having determined there is legally and factually sufficient evidence to support the trial court's finding that Integrity Pain breached the 2017 Agreement and Letter Agreement in this manner, we need not determine whether Integrity Pain also breached the 2017 Agreement by failing to timely pay the October 2, 2018 statement within ten days of receiving DAMC's invoice.

DAMC "performed the follow-up work on everything after" the termination date. This argument by Integrity Pain is conditioned on Integrity's Pain strict interpretation of the contract that we have rejected. We have found no error by the trial court's interpretation of the contract, and DAMC, through Davis's testimony, presented legally and factually sufficient evidence to support the total amount of payments received and the commission owed based on such payments.

### IMPOSITION OF SPECIFIC PERFORMANCE

Integrity Pain argues the trial court erred in ordering specific performance of the 2017 Agreement and Letter Agreement. We review a trial court's decision to award specific performance for abuse of discretion. *Subissi Holdings, L.P. v. Hilcorp Energy I, L.P.*, No. 04-07-00674-CV, 2008 WL 2515698, at \*6 (Tex. App.—San Antonio June 25, 2008, no pet.) (citing *Walzem Dev. Co. v. Gerfers*, 487 S.W.2d 219, 222 (Tex. App.—San Antonio 1972, writ ref'd n.r.e.)).

"In examining whether specific performance via injunctive relief is available as a contractual remedy, courts examine whether (1) an adequate remedy at law exists; (2) present performance is possible; (3) the agreement contains precise terms capable of enforcement; and (4) the injunction comports with the terms of the agreement." *Cytogenix, Inc. v. Waldroff*, 213 S.W.3d 479, 487 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Here, the trial court's judgment ordered Integrity Pain to

1) provide to [DAMC], on a weekly basis, the accounts receivable records of all payments that [Integrity Pain], and its agents, servants, employees, and attorneys, have received or will receive from any source, on or after December 1, 2020, which relate to claims for which [DAMC] previously rendered billing services to [Integrity Pain], as reflected in the [DAMC] Aging Report for [Integrity Pain] (Plaintiff's Exhibit P-34) and/or the [DAMC] Statements of Account for [Integrity Pain] (Plaintiff's Exhibits P-35 through P-37); and

2) pay each invoice sent by [DAMC] to [Integrity Pain] for the six-percent commission owed to [DAMC] based on said payments, within ten (10) days of its receipt of each said invoice.

Integrity Pain argues that because DAMC did not perform *all billing services* on the list of files it contends it is owed a 6% commission, the trial court erred in awarding specific performance. It also argues that the award of specific performance exceeds the scope of the 2017 Agreement and Letter Agreement because only payment on collections for *all billing services* was contemplated by the 2017 Agreement and Letter Agreement. Both these arguments are based on Integrity Pain's strict interpretation of the 2017 Agreement and Letter Agreement that we have rejected.

Further, Integrity Pain argues that DAMC was not entitled to specific performance because it did not show it had an inadequate remedy at law or an irreparable injury. *See Cytogenix*, 213 S.W.3d at 487 ("[C]ourts do not enforce contractual rights by permanent injunction unless an aggrieved party can show an inadequate remedy at law and irreparable injury."). "An 'irreparable injury' is one for which actual damages will not adequately compensate the injured party or the damages cannot be measured by any certain pecuniary standard." *Id*. "Money damages constitute satisfaction for injury resulting from a breach, whereas an injunction decrees specific performance, restraining any breach that would otherwise cause damage." *Id*. "The two remedies thus are exclusive of one another." *Id*.

Here, the trial court awarded money damages based on the six percent commission DAMC should have earned (but had not previously invoiced) for payments received by Integrity Pain from October 2018 through mid-December 2020 on past-billed accounts, as reflected in Plaintiff's Exhibits P-40 through P-131. With respect to payments received on past-billed accounts after that date (for which DAMC was entitled to a six-percent commission), the trial court awarded specific performance by ordering Integrity Pain to send DAMC the accounts receivable records of all payments regarding claims for which DAMC previously rendered billing services, as reflected in

the Aging Report for Integrity Pain (Plaintiff's Exhibit 34) and/or the Statements of Account for Integrity Pain (Plaintiff's Exhibits P-35 through P-37). Integrity Pain argues "there is no irreparable injury" because Integrity Pain "has not breached any agreement that would give rise to such onerous requirements." This argument, once again, relies on the strict interpretation of the 2017 Agreement and Letter Agreement that we have rejected.

Integrity Pain further argues that the trial court erred in awarding specific performance because the obligations under the trial court's judgment would be perpetual. It cites legal authority for the proposition that specific performance via an injunction can be ordered only if present performance is possible. *See Cytogenix*, 213 S.W.3d at 487. "A court should not decree future contractual performance by requiring a party to perform a continuous series of acts, extending through a long period of time, over which the court exercises its supervision." *Id*. Integrity Pain emphasizes that the specific performance ordered in this case is "not a one-time transaction such as the sale of land that can be entirely performed in the present," but instead requires the trial court to "referee Integrity [Pain]'s ongoing compliance indefinitely into the future." However, as pointed out by DAMC, Integrity Pain's obligations are not perpetual and relate only to specific accounts as described in Plaintiff's Exhibits 34-37. DAMC stresses that (1) those accounts will either be paid over time or be deemed uncollectible; (2) there is no evidence to suggest the trial court's supervision will be needed perpetually; and (3) Integrity Pain did not request a limitation on the duration of the trial court's order of specific performance nor did it request any additional or amended findings regarding the duration of the trial court's order. *See* TEX. R. CIV. P. 298 (stating that after a trial court files original findings of fact and conclusions of law, any party may request "specified additional or amended findings or conclusions"); *Villalpando v. Villalpando*, 480 S.W.3d 801, 810 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("The failure to request amended or additional findings or conclusions waives the right to complain on appeal about the

trial court's failure to make the omitted findings or conclusions."). We agree with DAMC. The trial court has not abused its discretion by ordering specific performance in perpetuity. Its order clearly refers to the particular accounts for which Integrity Pain will need to track accounts receivable. There is no evidence in the record to suggest the trial court's supervision will be needed perpetually.

Integrity Pain also argues that the trial court's order of specific performance is "onerous" because it will need to compare patient names of paid accounts to Plaintiff's Exhibits 34-37. DAMC notes that (1) there is no evidence to support Integrity Pain's contention; and (2) Integrity Pain did not request amended or additional findings by the trial court on this issue. *See* TEX. R. CIV. P. 298; *Villalpando*, 480 S.W.3d at 810. We agree with DAMC that there is no evidence that the trial court's order is "onerous."

For the reasons stated above, we hold the trial court did not abuse its discretion in awarding specific performance.

### CROSS-ISSUE: AWARD OF ATTORNEY'S FEES

DAMC brings a cross-issue on appeal, arguing the trial court erred in not awarding it attorney's fees under chapter 38 of the Texas Civil Practice and Remedies Code. Because this case was filed before September 1, 2021, former section 38.001 applies to this case. *See* Acts 2021, 87th Leg., R.S., ch. 665, § 2 (H.B. 1578) (providing that the "change in law made by this Act applies only to an award of attorney's fees in an action commenced on or after" its effective date of September 1, 2021). Former section 38.001(a) provided that "[a] person may recover reasonable attorney's from *an individual or corporation*, in addition to the amount of a valid claim and costs, if the claim is for . . . (8) an oral or written contract." Acts 1985, 69th Leg., ch. 959, § 1 (Former section 38.001(a)(8)) (emphasis added).

In Conclusion of Law 14, the trial court stated DAMC was not entitled to recover attorney's fees pursuant to chapter 38 because Integrity Pain is not "an individual or corporation." DAMC acknowledges that this court previously held in *8305 Broadway Inc. v. J & J Martindale Ventures, LLC*, No. 04-16-00447-CV, 2017 WL 2791322, at *4 (Tex. App.—San Antonio June 28, 2017, no pet.), that "[b]ased on the plain meaning of the terms 'individual' and 'corporation,'" former section 38.001(a)(8) did not provide "for an award of attorney's fees against limited liability companies." On appeal, DAMC requests that we reconsider this former precedent and revisit the issue. We decline to do so. Thus, in applying our former precedent, we hold Integrity Pain, as a professional limited liability company, was not liable for an award of attorney's fees under former section 38.001(a)(8). *See 8305 Broadway*, 2017 WL 2791322, at *5 ("We agree with the analysis of our sister courts and similarly hold 8035 Broadway was not entitled to recover attorney's fees against Martindale because it is a limited liability company.").

## CONCLUSION

Having found no error by the trial court, we affirm its judgment.


Liza A. Rodriguez, Justice